DALLAS AREA RAPID TRANSIT,
Petitioner,

v.

AMALGAMATED TRANSIT UNION
LOCAL NO. 1338, Respondent.

No. 06–0034.

Supreme Court of Texas.

Argued Nov. 14, 2007.

Decided Dec. 19, 2008.

Jeffrey C. Londa, Steven E. Hart, Dennis C. Gardner, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Houston, Hyattye O. Simmons, Dallas Area Rapid Transit Legal Department, Harold R. McKeever, Dallas, for Petitioner.

Hal K. Gillespie, Joseph Halcut Gillespie, Gillespie, Rozen, Watsky, Motley & Jones, P.C., Dallas, for Respondent.

Justice HECHT delivered the opinion of the Court.

Section 13(c) of the federal Urban Mass Transit Act of 1964 (the "UMTA", now the Federal Transit Act) conditions a public transportation authority's receipt of federal financial assistance on "arrangements the Secretary of Labor concludes are fair and equitable" to protect "the interests of employees affected by the assistance".[1] Such arrangements "shall include provisions that may be necessary for ... the preservation of rights, privileges, and benefits ... [and] the protection of individual employees against a worsening of their positions related to employment".[2]

In this case, a public transportation authority and its employees' union, operating under a 13(c) arrangement, resolved a general grievance over wages and benefits. The authority did not adhere to the resolution, and the union sued for breach of contract. The lower courts concluded that

---

**1.** Pub.L. No. 88–365, § 10(c), 78 Stat. 302, 307, redesignated as § 13(c) by Pub.L. No. 89–562, § 2, 80 Stat. 715, 716, as amended, now codified at 49 U.S.C. § 5333(b) (2006) ("As a condition of financial assistance under ... this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance ... shall specify the arrangements.").

**2.** *Id.* § 5333(b)(2) ("Arrangements under this subsection shall include provisions that may be necessary for—(A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (B) the continuation of collective bargaining rights; (C) the protection of individual employees against a worsening of their positions related to employment; (D) assurances of employment to employees of acquired public transportation systems; (E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and (F) paid training or retraining programs.").

the authority is not immune from suit.[3] The issue before us is whether section 13(c) preempts an authority's immunity from suit under state law. We hold that immunity is not preempted and that the union's recourse is to the procedures approved in the 13(c) arrangement. Accordingly, we reverse the judgment of the court of appeals and dismiss the case.

## I

Petitioner Dallas Area Rapid Transit is a regional public transportation authority[4] that performs only governmental functions[5] and is immune from suit under Tex-as law.[6] Created in 1983 and funded with a one-cent sales tax,[7] DART assumed the operations of the Dallas Transit System, which the City of Dallas had acquired in 1963 from the privately owned Dallas Transit Company.[8] Company employees, and later System employees, were represented by Amalgamated Transit Union Local No. 1338, which now represents DART employees. ATU 1338 engaged in collective bargaining with the Company,[9] but Texas law prohibits a state political subdivision from collective bargaining with public employees.[10] This prohibition has been held to apply to the System,[11] DART,[12] and their employees, and ATU 1338 does not challenge its application here.[13] But public

3. 173 S.W.3d 896, 900 (Tex.App.-Dallas 2005).

4. *See* Tex. Transp. Code §§ 452.001–.720.

5. *Id.* § 452.052(c) ("An authority is a governmental unit ... and the operations of the authority are not proprietary functions for any purpose....").

6. *See Guillory v. Port of Houston Auth.*, 845 S.W.2d 812, 812–815 (Tex.1993) (treating a port authority with only governmental functions as a political subdivision of the State for purposes of governmental immunity).

7. *See* Dart History, Dallas Area Rapid Transit, http://www.dart.org/about/history.asp (last visited October 31, 2008).

8. *See Dallas Area Rapid Transit v. Plummer*, 841 S.W.2d 870, 872 (Tex.App.-Dallas 1992, writ denied), *disapproved in part on other grounds by Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 445–446, n. 17 (Tex.1994); *Amalgamated Transit Union Local 1338 v. Dallas Public Transit Bd.*, 430 S.W.2d 107, 109 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 99, 24 L.Ed.2d 89 (1969).

9. *See Local 1338*, 430 S.W.2d at 109–110.

10. Tex. Gov't Code § 617.002("(a) An official of the state or of a political subdivision of the state may not enter into a collective bargaining contract with a labor organization regarding wages, hours, or conditions of employment of public employees. (b) A contract entered into in violation of Subsection (a) is void. (c) An official of the state or of a political subdivision of the state may not recognize a labor organization as the bargaining agent for a group of public employees."), formerly Tex.Rev.Civ. Stat. Ann. art. 5154c, first enacted by Act of April 17, 1947, 50th Leg., R.S., ch. 135, 1947 Tex. Gen. Laws 231.

11. *Local 1338*, 430 S.W.2d at 113–114.

12. *Stephens v. Dallas Area Rapid Transit*, 50 S.W.3d 621, 632–634 (Tex.App.-Dallas 2001).

13. Similar governmental entities are treated as state political subdivisions. *See* Tex. Gov't Code § 791.003(5) ("In this chapter: ... 'Political subdivision' includes any corporate and political entity organized under state law."); Tex Local Gov't Code § 335.075(a) (referring to "a political subdivision, including a metropolitan rapid transit authority created under Chapter 451, Transportation Code"); *id.* § 391.002(1) ("In this chapter: ... 'Governmental unit' means a[n] ... authority ... or other political subdivision of the state."); Tex. Nat. Res.Code § 11.082(d)(4) ("In this section: ... 'Political subdivision' means a ... special-purpose district or authority."); Tex. Transp. Code § 228.251(2) ("In this subchapter: ... 'Local governmental entity' means a political subdivision of the state, including ... a transportation corporation created under Chapter 431."); *id.* § 366.003(8) (same); *id.* § 370.003(8) (same); *id.* 370.032(a) ("[A regional mobility authority] is a body politic and corporate and a political subdivision of this state.").

employees may "present grievances concerning their wages, hours of employment, or conditions of work either individually or through a representative that does not claim the right to strike," [14] and ATU 1338 has presented grievances for DART employees.

DART receives federal financial assistance conditioned on a 13(c) Arrangement that was negotiated with ATU 1338 and approved by the Secretary of Labor on September 30, 1991. Attachment B to the 1991 Arrangement sets out "general grievance procedures ... for the purpose of giving an employee, individually or through such employee's representative, the opportunity to present grievances and appeals regarding establishment of, or failure to establish, specified wages, hours or conditions of work". For our purposes, those procedures may be summarized as follows:

- General grievances must be presented in writing to the human resources department head, who must meet with the employee or representative, provide a full hearing and review, and issue a written decision.
- The employee or representative may appeal to the executive director or invoke a fact-finding process.
- The fact-finding process is conducted by a three-member panel. One member is selected by each side, and the third is selected from a list of neutrals. After gathering facts, conducting hearings, and considering the opposing positions, the panel must issue a written report, making recommendations on unresolved issues.
- If the panel is unanimous, "the recommendations shall be deemed agreed upon as a final resolution of the issues submitted, except as otherwise modified

by the parties' mutual agreement." But either partisan member of the panel may dissent. The panel must publish its findings and recommendations, and any dissents, in the local media.

- "[T]he fact-finding report and recommendations shall be advisory only" and shall not be binding on either party.[15]

The provisions of Attachment B, with minor changes, were included as section 8.10 of DART's Hourly Employment Manual.

In April 2001, ATU 1338 filed a general group grievance on behalf of DART employees seeking wage increases and better benefits. The grievance did not result in a fact-finding panel report under the Attachment B procedures; instead, DART and ATU 1338 signed a "General Grievance Resolution" in June 2002. The Resolution provided, among other things, that hourly employees would receive three annual 4% pay increases effective October 2001, October 2002, and October 2003. The Resolution stated that it "constitute[d] a final resolution to the issues raised in the General Grievance", barred ATU 1338 from filing another general grievance "concerning terms and conditions of employment, specified wages, hours, and conditions of work" for three years, and stated that "DART agrees that for the three year period it will not make any unilateral changes to DART's Hourly Employment Manual except for those issues remaining open herein." But the Resolution also contained important reservations under the heading, "Management Rights":

1. DART, at its sole discretion, possesses the right in accordance with applicable laws, to manage all operations, including the direction of the working force and the right to plan, direct and control the operation of all equipment

---

14. Tex. Gov't Code § 617.005.

15. The clause adding that the report and recommendations "shall not be binding" appears in DART's Hourly Employment Manual.

and other property of DART, except as modified by Section 8.10 of the DART Hourly Employment Manual and Section 617.005 of the Texas Government Code and DART's 13(c) Capital Arrangement certified by the Department of Labor on September 30, 1991 pursuant to USC § 5333(b), if applicable.... [N]othing herein changes DART's position that it has a unilateral right to establish employment conditions, set wages, hours of employment or conditions of work. In the event that DART makes any unilateral change except for issues remaining open herein during the term of this Resolution, such change relieves Local 1338 of its commitment not to file a General Grievance from October 1, 2001 to September 30, 2004.

2. Matters of inherent managerial policy are reserved exclusively to DART under law. These include but shall not be limited to such areas of discretion or policy as the functions and programs of DART, standards of service, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

3. The listing of specific rights in this article is not intended to be, nor should be considered, restrictive or a waiver of any rights of management not listed and not specifically surrendered herein whether or not such rights have been exercised by DART in the past.

4. DART intends to abide by the provisions herein, and to resolve the general grievance as herein stated. By resolving this general grievance, DART does not intend to waive its legal obligations, including those set forth in its 13(c) Arrangement and its position that it may not legally enter into a legally binding and bilateral agreement with a labor organization regarding wages, hours, or conditions of employment of public employees. This general grievance is therefore resolved subject to all the foregoing limitations.

DART gave its employees the pay raises in 2001 and 2002, but not in 2003, and it unilaterally reduced other benefits, asserting that declining sales tax revenues required cost-saving measures. ATU 1338 sued for breach of contract based on DART's failure to comply with the 2002 Resolution. ATU 1338 sought money damages and injunctive relief. DART filed a plea to the jurisdiction claiming governmental immunity, which the trial court denied. On DART's interlocutory appeal, the court of appeals affirmed, holding that section 13(c) of the UMTA, as interpreted by the United States Supreme Court in *Jackson Transit Authority v. Local Div. 1285, Amalgamated Transit Union*,[16] preempted DART's immunity from ATU 1338's suit:

Assuming state law provides that DART, as a governmental entity, is immune from suit, this immunity would obstruct accomplishing and executing Congress's full purposes and objectives under the UMTA. The UMTA, as interpreted in *Jackson Transit Authority,* is clear: state law is to control labor relations between local governments and unionized transit workers, as long as the workers' collective-bargaining rights are preserved before a local government receives federal aid. Congress designed section 13(c) of the UMTA "as a means to accommodate state law to collective bargaining." *Jackson Transit Auth.,* 457 U.S. at 27, 102 S.Ct. 2202, 72 L.Ed.2d 639. Although section 13(c) may be narrowly drafted to minimize its effects on state labor law, Congress's clear intent was to preserve collective-bargaining rights. Where state immunity law would preclude enforcement of

16. 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982).

the rights preserved under section 13(c), Congress's objectives could not be accomplished. Therefore, state immunity law "is preempted and has no effect." [17]

We granted DART's petition for review.[18]

## II

We begin with ATU 1338's argument that we lack jurisdiction over this interlocutory appeal. DART contends that we have jurisdiction because the court of appeals' decision conflicts with section 13(c) and *Jackson Transit Authority*. We first consider the extent of our jurisdiction and then how to apply it in this case.

### A

Without an intermediate appellate court in Texas, this Court's workload soon became unmanageable.[19] The Constitution of 1876 limited the Supreme Court's appellate jurisdiction to civil cases and created a court of appeals for criminal cases and civil cases from county courts,[20] but this did little to alleviate the burden.[21] To preserve a right of appeal that was both broad and effective, constitutional amendments adopted in 1891 restructured the judiciary.[22] The Supreme Court's jurisdiction remained limited to civil cases.[23] The court of appeals became the Court of Criminal Appeals, with jurisdiction over criminal cases only.[24] The Legislature was required to divide the State into separate judicial districts and establish in each district a court of civil appeals with appellate jurisdiction over all civil cases in that district,[25] thereby placing appellate courts closer to the litigants and relieving the burden on the Supreme Court. To ensure uniformity in the development of the civil law, the 1891 constitutional amendments gave the Supreme Court appellate jurisdiction over "questions of law arising in the cases in the Courts of Civil Appeals in which the Judges of any Court of Civil Appeals may disagree, or where the several Court of Civil Appeals may hold differently on the same question of law".[26]

The enabling legislation enacted in 1892 reflected this constitutional priority while shifting the burden of appellate caseloads to the intermediate courts. The Supreme Court's jurisdiction was limited to cases in which the Courts of Civil Appeals had rendered a final judgment, as opposed to remanding for further proceedings, but there were exceptions to that limitation for cases in which Supreme Court review even at an intermediate stage was important. Three exceptions were for "[c]ases in which a civil court of appeals overrules its own decisions or the decision of another court of civil appeals or of the supreme court", "[c]ases in which the judges of any court of civil appeals may disagree", and "[c]ases in which any two of the courts of civil appeals may hold differently on the

---

17. 173 S.W.3d 896, 900 (Tex.App.-Dallas 2005) (citations omitted).

18. 50 Tex. Sup.Ct. J. 929 (June 29, 2007).

19. *See* 1 GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 399 (1977).

20. TEX. CONST. art. V, §§ 3, 6 (1876).

21. *See* 1 BRADEN, *supra* note 19, at 365 ("Despite the transfer of all criminal jurisdiction and some civil cases to the court of appeals in

1876, the supreme court's docket remained overcrowded.").

22. *Id.* at 399 ("The supreme court was falling so far behind that either the right to appeal had to be severely curtailed or the system had to be radically revised.").

23. TEX. CONST. art. V, § 3 (1891).

24. *Id.* §§ 4–5.

25. *Id.* § 6.

26. *Id.* § 3.

same question of law".[27] As we observed in 1895, these exceptions "were inserted for the purpose of enabling this court, *upon the first opportunity,* to settle questions of law upon which conflicting opinions were held by any of the courts having appellate jurisdiction,—so far, at least, as the opinion of this court can settle such questions".[28] Obviously, allowing conflicts in the law among the Courts of Civil Appeals to go unresolved could generate confusion that would offset the gains in efficiency those courts were designed to accomplish. The Supreme Court's jurisdiction was enlarged to provide for resolution of such conflicts. In 1913, the Court's jurisdiction was extended to all cases from the Courts of Civil Appeals, even if remanded,[29] and that remains the law.[30]

The 1892 legislation made decisions in a few types of cases final in the Courts of Civil Appeals, irrespective of conflicts among the courts. These were boundary and election disputes, slander and divorce cases, interlocutory appeals, and cases within the constitutional county courts' jurisdiction except probate matters and cases involving revenue laws or the validity of a statute.[31] But by 1953, the Legislature had concluded that the Supreme Court's jurisdiction should extend to all cases "in which the judges of the Courts of Civil Appeals may disagree upon any question of law material to the decision, or in which one of the Courts of Civil Appeals holds differently from a prior decision of another Court of Civil Appeals or of the Supreme Court upon a question of law".[32] That is the current law.[33]

Although the statutes governing this Court's jurisdiction have specifically addressed conflicts between our intermediate appellate courts and this Court, none has addressed conflicts between those courts and the United States Supreme Court. Such a conflict was presented in a 1979 divorce case, *Eichelberger v. Eichelberger.*[34] At that time, decisions in divorce cases were still final in the courts of civil appeals absent conflicts among Texas courts.[35] The court of civil appeals had

27. Act approved April 13, 1892, 22nd Leg., 1st C.S., ch. 14, § 1, 1892 Tex. Gen. Laws 19, 20, *reprinted in* 10 *H.P.N. Gammel, The Laws of Texas 1822–1897,* at 383, 384 (Austin, Gammel Book Co. 1898), formerly TEX.REV.CIV. STAT. ANN art. 1728 (1925).

28. *Sturgis Nat'l Bank v. Smyth,* 87 Tex. 649, 30 S.W. 898, 898 (1895) (emphasis added).

29. Act approved March 28, 1913, 33rd Leg., R.S., ch. 55, § 1, 1913 Tex. Gen. Laws 107, 107.

30. TEX. GOV'T CODE § 22.001(a)(1)-(2).

31. Act approved April 13, 1892, 22nd Leg., 1st C.S., ch. 15, § 5, 1892 Tex. Gen. Laws 25, 26, *reprinted in* 10 *H.P.N. Gammel, The Laws of Texas 1822–1897,* at 389, 390 (Austin, Gammel Book Co. 1898), formerly TEX.REV.CIV. STAT. ANN. art. 1821 (1925).

32. Act of May 19, 1953, 53rd Leg., R.S., ch. 424, § 2, 1953 Tex. Gen. Laws 1026, 1027; *see State v. Wynn,* 157 Tex. 200, 301 S.W.2d 76, 77–78 (1957) (per curiam); *Cone v. Cone,* 153 Tex. 149, 266 S.W.2d 860, 861 (1954) (per curiam).

33. TEX GOV'T CODE § 22.225(c). Pursuant to a constitutional amendment adopted in a 1980 election, the courts of civil appeals were renamed courts of appeals, and given criminal jurisdiction in 1981. TEX. CONST. art. V § 6; Tex. S.J. Res. 36, 66th Leg., R.S., §§ 5, 7, 1979 Tex. Gen. Laws 3223, 3224–3225, 3226 (effective Sept. 1, 1981); Act of June 1, 1981, 67th Leg., R.S., ch. 291, §§ 101–102, 149, 1981 Tex. Gen. Laws 761, 801–802, 820 (amending TEX.CODE CRIM. PROC. arts. 4.01, 4.03, effective Sept. 1, 1981).

34. 582 S.W.2d 395 (Tex.1979).

35. This finality was removed in 1987. Act of May 29, 1987, 70th Leg., R.S., ch. 1106, § 2, 1987 Tex. Gen. Laws 3804, 3804.

held that federal law did not preempt a divorce court's division of future railroad retirement benefits between spouses.[36] While the case was pending in this Court, the United States Supreme Court reached the opposite conclusion.[37] Although there was no statutory basis for this Court to take jurisdiction of the case, we concluded that we were constitutionally required to do so:

> We hold that under Article V, Sections 1 [38] and 3,[39] of the Constitution of Texas, the Supreme Court of Texas possesses the power, and thus the duty, to correct a decision of a Court of Civil Appeals that conflicts with the "supreme law of the land" [40] as established by the Congress and Supreme Court of the United States.[41]

Consistent with the Supreme Court's decision, we reversed the judgment of the court of civil appeals in part and rendered judgment.[42]

In the nearly thirty years since we decided *Eichelberger*, we have not invoked our constitutional jurisdiction to remove a conflict between a Texas appellate court and the United States Supreme Court,[43] but we adhere to our holding that this Court has such jurisdiction. From 1892 to 1953, the decisions of the courts of civil appeals were final in some cases and not subject to this Court's review, but this Court has never lacked jurisdiction to prevent an intermediate appellate court from conflicting with one of this Court's decisions.[44] It is fundamental to the very structure of our appellate system that this Court's decisions be binding on the lower courts.[45] We have no less authority to ensure that the lower courts follows the United States Supreme Court.

Nor should our holding in *Eichelberger* apply with any less force in interlocutory appeals.[46] On the contrary, the fact that provision has been made for an interlocu-

---

**36.** *Eichelberger v. Eichelberger,* 557 S.W.2d 587, 589 (Tex.Civ.App.-Waco 1977), *rev'd and rendered in part and aff'd in part,* 582 S.W.2d 395 (Tex.1979).

**37.** *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 585–586, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979).

**38.** Tex. Const. art. V, § 1 states in part: "The judicial power of this State shall be vested in one Supreme Court, in one Court of Criminal Appeals, in Courts of Appeals, in District Courts, in County Courts, in Commissioners Courts, in Courts of Justices of the Peace, and in such other courts as may be provided by law."

**39.** *Id.* art. V, § 3 states in part: "The Supreme Court shall exercise the judicial power of the state except as otherwise provided in this Constitution.... Its appellate jurisdiction shall be final and shall extend to all cases except in criminal law matters and as otherwise provided in this Constitution or by law."

**40.** U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby,

any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

**41.** *Eichelberger,* 582 S.W.2d at 397.

**42.** *Id.* at 403.

**43.** *Cf. County of Dallas v. Sempe,* 262 S.W.3d 315, 315–316 (Tex.2008) (per curiam) (concluding that the court of appeals' decision did not conflict with a decision of the United States Supreme Court).

**44.** Even if appellate jurisdiction were restricted, we have noted that such a conflict could be corrected by writ of mandamus. *State v. Wynn,* 157 Tex. 200, 301 S.W.2d 76, 78 (1957) (per curiam).

**45.** *In re K.M.S.,* 91 S.W.3d 331, 331 (Tex. 2002) (per curiam) ("[I]n reaching their conclusions, courts of appeals are not free to disregard pronouncements from this Court...."); *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989) ("This court need not defend its opinions from criticism from courts of appeals; rather they must follow this court's pronouncements.").

**46.** *Cf. In re H. V.,* 252 S.W.3d 319, 323 n. 26 (Tex.2008) (expressly refusing to reach the issue).

tory appeal indicates that the Legislature has determined that appellate review before a final judgment is important. It is surely no less important when a court of appeals' decision conflicts, not with another court of appeals' decision or a decision of this Court, but with a decision of the United States Supreme Court.

Accordingly, we conclude that we have jurisdiction over this case if the court of appeals's decision conflicts with the United States Supreme Court's decision in *Jackson Transit Authority*.

**B**

■ We turn, then, to the question whether such a conflict exists. A court of appeals holds differently from this Court "when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants."[47] We use this same standard in determining whether the court of appeals in this case has held differently from the United States Supreme Court.

In *Jackson Transit Authority*, the public transportation authority in Jackson, Tennessee had a 13(c) arrangement that guaranteed its employees' collective-bargaining rights, but the authority later refused to abide by a collective-bargaining agreement.[48] The union sued the authori-

ty in federal court for breach of both the 13(c) arrangement and the collective-bargaining agreement, but the district court dismissed the suit for want of subject-matter jurisdiction.[49] The court of appeals reversed, holding that the district court had federal-question jurisdiction[50] because the union's claim arose under the laws of the United States, and additionally, that section 13(c) implicitly provides for a federal cause of action.[51] The Supreme Court agreed that the district court had federal-question jurisdiction[52] but held that section 13(c) did not create a federal cause of action for breach of either the 13(c) arrangement or the collective-bargaining agreement.[53]

Under Tennessee law, the Jackson Transit Authority was authorized to enter into collective-bargaining agreements with its employees at the time its dispute with the union arose,[54] and the authority did not contend that it was immune from suit to enforce its agreements. Thus, the Supreme Court was not confronted with any issue of federal preemption of state governmental immunity. But DART and ATU 1338 argue that passages in the Supreme Court's opinion indicate its views on the subject. As DART points out, the Supreme Court emphasized that Congress intended section 13(c) arrangements and agreements under them to be governed by state law, not federal law:

47. Tex. Gov't Code § 22.001(e).

48. 457 U.S. 15, 18–19, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982). The authority contended that the union's agreement was with the authority's former manager, not with the authority itself. *Id.* at 19 n. 3, 102 S.Ct. 2202; *see Local Div. 1285, Amalgamated Transit Union v. Jackson Transit Auth.*, 1990 Tenn.App. LEXIS 901, at *5–*9, 1990 WL 210310, at *2–*4 (Tenn.Ct.App. Dec. 26, 1990).

49. 457 U.S. at 19, 102 S.Ct. 2202; 447 F.Supp. 88, 93–95 (W.D.Tenn.1977).

50. 28 U.S.C. § 1331 (2006).

51. 457 U.S. at 19–20, 102 S.Ct. 2202; 650 F.2d 1379, 1383 (6th Cir.1981).

52. 457 U.S. at 21 n. 6, 102 S.Ct. 2202.

53. *Id.* at 29, 102 S.Ct. 2202.

54. *See* Tenn.Code Ann. §§ 7–56–101 to –109. Prior to 1971, when these statutes were enacted, one court had held in *Weakley County Mun. Elec. Sys. v. Vick*, 43 Tenn.App. 524, 309 S.W.2d 792 (1957), that a governmental entity could not engage in collective bargaining with its employees. *See Local Div. 1285*, 1990 Tenn.App. LEXIS 901, at *4, 1990 WL 210310, at *1.

A consistent theme runs throughout the consideration of § 13(c): Congress intended that labor relations between transit workers and local governments would be controlled by state law.[55]

\* \* \*

Thus, Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local governmental entities and transit workers. Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations. Congress intended that § 13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid could be used to convert private companies into public entities. But Congress designed § 13(c) as a means to accommodate state law to collective bargaining, not as a means to substitute a federal law of collective bargaining for state labor law.[56]

DART argues that federal law should not preempt state immunity law any more than state labor law. But as ATU 1338 points out, other passages contemplate state-court actions to enforce section 13(c) arrangements and agreements under them:

Indeed, since § 13(c) contemplates protective arrangements between grant recipients and unions as well as subse-

quent collective-bargaining agreements between those parties, it is reasonable to conclude that Congress expected the § 13(c) agreement and the collective-bargaining agreement, like ordinary contracts, to be enforceable by private suit upon a breach. . . .

The issue, then, is not whether Congress intended the union to be able to bring contract actions for breaches of the two contracts, but whether Congress intended such contract actions to set forth federal, rather than state, claims.[57]

\* \* \*

Given this explicit legislative history, we cannot read § 13(c) to create federal causes of action for breaches of § 13(c) agreements and collective-bargaining contracts between UMTA aid recipients and transit unions. The legislative history indicates that Congress intended those contracts to be governed by state law applied in state courts.[58]

ATU 1338 argues that the right to sue a transportation authority to enforce its agreements is implicit in the Supreme Court's opinion.

The court of appeals agreed with ATU 1338, but we think both DART's and ATU 1338's arguments read far too much into the Supreme Court's opinion. The issue of federal preemption of state immunity law was simply not presented in the case, and we do not think the Supreme Court would have resolved it merely by implication. Even if we were mistaken about the Supreme Court's intention, we see no way to infer from its opinion what view it might take of the preemption issue. The court of appeals' decision is inconsistent with *Jackson Transit Authority* because the court of

---

**55.** 457 U.S. at 24, 102 S.Ct. 2202.

**56.** *Id.* at 27–28, 102 S.Ct. 2202 (footnotes and citation omitted).

**57.** *Id.* at 20–21, 102 S.Ct. 2202 (citation omitted).

**58.** *Id.* at 29, 102 S.Ct. 2202 (footnote omitted).

appeals read the opinion in that case to decide the preemption issue in the present case. The court of appeals' decision creates uncertainty in the law that is certainly unnecessary and may result in unfairness to litigants. The importance of clarity in the area is illustrated by the fact that the Supreme Court granted certiorari in *Jackson Transit Authority* "[b]ecause of the importance of the interpretation of § 13(c) for local transit labor relations".[59] For the same reason, we conclude it is important for this Court to reach the preemption issue presented in this case.

### III

■ We come at last to the issue itself, which is a narrow one. DART, for its part, concedes that it would not be immune from suit by ATU 1338 to require that the grievance procedures laid out in the Arrangement be followed. If, for example, DART refused to provide the hearing called for, or to engage in the prescribed fact-finding process, DART acknowledges that ATU 1338 could sue to enforce the Arrangement. ATU 1338, on the other hand, does not challenge the adequacy of the 1991 Arrangement under section 13(c) or argue that Texas law prohibiting collective bargaining by public employees is inapplicable to DART or is preempted by section 13(c). And while ATU 1338 argued below that DART is not immune from suit on its agreements, it has abandoned those arguments in this Court. We accept with-

out comment all these concessions for purposes of this case. The issue before us comes down to this: does section 13(c) preempt DART's immunity from ATU 1338's suit to enforce the 2002 Resolution?

■ Federal law can preempt state law expressly or implicitly.[60] ATU 133 8 does not contend that the UMTA contains any express preemption of state law. The United States Supreme Court has summarized implicit preemption as follows:

[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[61]

ATU 1338 focuses on the latter component of implied preemption, arguing that by preventing suit to enforce the 2002 Resolution, state immunity law stands as an obstacle to achieving the full purpose of section 13(c) to protect transit employees' interests.

But section 13(c) requires only that a transportation authority make arrangements that "the Secretary of Labor concludes are fair and equitable."[62] The 1991

**59.** *Id.* at 20, 102 S.Ct. 2202 (footnote omitted).

**60.** *Freightliner Corp. v. Myrick*, 514 U.S. 280, 286–287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex.2001).

**61.** *Freightliner*, 514 U.S. at 287, 115 S.Ct. 1483 (citations and internal quotation marks omitted); *see also Great Dane*, 52 S.W.3d at 743.

**62.** Pub.L. No. 88–365, § 10(c), 78 Stat. 302, 307, redesignated as § 13(c) by Pub.L. No. 89–562, § 2, 80 Stat. 715, 716, as amended, now codified at 49 U.S.C. § 5333(b) (2006) ("As a condition of financial assistance under ... this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance ... shall specify the arrangements.").

Arrangement was negotiated with ATU 1338 and was approved by the Secretary of Labor. As we have noted, ATU 1338 does not argue that the Arrangement is less than fair and equitable as required by section 13(c). The Arrangement, which achieves the full purposes of section 13(c), does not provide for binding or judicially enforceable general grievance resolutions. Under Attachment B, a hearing must be conducted, and if the grievance is not resolved, a fact-finding process ensues. But the end result of that process is an arbitration panel's report and recommendations that are expressly "advisory only" and not binding on either party. The report must be published in the local media, suggesting that the parties' recourse is then through political processes. Municipalities that are part of DART may be pressured to instruct the members each appoints to DART's governing board to adopt certain policies,[63] and municipalities may withdraw from DART altogether.[64]

ATU 1338 acknowledges that a fact-finding report produced under Attachment B cannot be enforced in court but argues that the 2002 Resolution is different. ATU 1338 cannot explain, however, why it should be entitled to enforce a general grievance resolution to which DART agreed when the process would not have produced an enforceable result had it continued to the end. The Resolution expressly recognized that it did not change DART's "position that it has a unilateral right to establish employment conditions, set wages, hours of employment or conditions of work." The Resolution also recognized that DART was not waiving "its position that it may not legally enter into a legally binding and bilateral agreement with a labor organization regarding wages, hours, or conditions of employment of public employees." Although the Resolution recited DART's intention to comply with

its terms, it also provided that if DART made any unilateral change, the consequence would only be to relieve ATU 1338 of its commitment to a moratorium on filing general grievances.

ATU 1338 argues that for DART to be immune from this suit makes the Resolution pointless. But ATU 1338's complaint is with the 1991 Arrangement, not state immunity law. The Arrangement gave ATU 1338 no judicial recourse. DART's immunity from suit takes nothing away from ATU 1338 to which it was entitled under section 13(c). ATU 1338 argues that if it cannot sue to enforce the Resolution, it is left with no recourse at all. But the Resolution itself contemplates that if DART unilaterally failed to comply with its terms, ATU 1338 could simply file another general grievance and invoke the process provided by Attachment B.

Given that an arrangement can meet the requirements of section 13(c) without providing for judicial enforcement of grievance resolutions, nothing in that statute implicitly preempts state immunity law. Accordingly, we conclude that section 13(c) does not preempt DART's immunity from this suit.

\* \* \*

The judgment of the court of appeals is therefore reversed and the case is dismissed.

---

63. *See* TEX. TRANSP. CODE §§ 452.571–.580.

64. *Id.* §§ 452.651–.662.