**BROWN & BROWN OF TEXAS, INC.**
**f/k/a Poe & Brown of Texas, Inc. and**
**Transcontinental Insurance Company,**
**Appellants,**

v.

**OMNI METALS, INC., Appellee.**

**No. 01–05–01190–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 17, 2009.

Henry S. Platts Jr., Beirne, Maynard & Parsons, LLP, Houston, TX, Russell J. Bowman, Scott, Bowman & Stella, Dallas, TX, for Appellants.

Mark C. Harwell, Cotham, Harwell & Evans, Houston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and NUCHIA.*

## DISSENTING OPINION ON MOTION FOR EN BANC RECONSIDERATION

SAM NUCHIA, Justice (Retired).

I respectfully dissent. I believe the dispositive issue in this appeal is whether a person who is not a party to an insurance policy can nonetheless recover from the insurance company or its agent because of incorrect information regarding the scope of coverage. Here, the noninsured person sued the insurance company and its agent on negligence and DTPA[1] theories based on the insurance agent's oral statement and written certificate of insurance, which both erroneously represented that coverage existed for the uninsured person's property. Following the Texas Supreme Court's opinion in *Via Net v. TIG Insurance Co.*, I would hold that because the existence of coverage is a question of law to be determined by interpreting the insurance policy itself, a person who is not a party to an insurance policy cannot recover from the insurance company or its agent based on information outside of the actual policy. *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex.2006).

---

* Justice Sam Nuchia, who retired from the First Court of Appeals effective January 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on February 13, 2007.

1. Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.2009).

The equities in this appeal are mixed. There is testimony that Danny Sparks, an agent for Jacobe and later Poe & Brown, incorrectly described the stored-property policy exclusion to Blake McKnight, Port Metal's president. Sparks testified that by June 1993 he knew that Port Metal was charging a storage fee to its customers like Omni and that he failed to explain to McKnight that the insurance policy excluded the steel Omni was storing at Port Metal. The 1993 certificate contains the incorrect statement that Port Metal's insurance coverage "INCLUDES PROPERTY OF OTHERS IN CUSTODY OF INSURED." The 1994 and 1995 certificates contain the statement that the insurance covers "all risk."

On the other hand, McKnight testified that he did not read the 1995 insurance policy in effect at the time of the fire and that he was aware that Poe & Brown had recommended that he review the policy carefully. Omni's president, Arthur Tomes, testified at trial that he did not read the disclaimer and that it would not have made a difference to him if he had read the disclaimer:

Q. Now when you received, or when Omni would receive a certificate of insurance, what was done with it?

[Tomes] They would be put in a file.

Q. All right. Did you personally read and review every single certificate of insurance that came across to Omni?

[Tomes] No.

Q. Why not?

[Tomes] I would never—I mean, I'm assuming that what we are expecting to get under coverage—the coverage would be what they told us it was and that, you know, those would just be put in the file for our edification.

If someone asked us—or the bank or someone else, I mean, I would—I wouldn't read a policy. I don't think

anybody reads their insurance policies from front to bottom.

Q. Did you actually receive the insurance policy rather than the certificate of insurance?

[Tomes] No.

Q. Did you ever ask for an insurance policy?

[Tomes] No.

Q. Did you ever ask for an insurance policy from Poe & Brown related to Port Metal Processing?

[Tomes] No.

Q. Why not?

[Tomes] Because we would think that the certificate of insurance would be adequate to cover what we needed.

Regardless of the equities, we must determine whether the law requires people to read insurance contracts, or whether it allows them to rely on extra-contractual statements. I recognize there is no simple policy answer to this question. If the law requires that the actual policy controls over any other written or oral statements, including certificates of insurance, then there is a significant burden on anyone relying on the promise of insurance to verify that the desired coverage actually exists. Conversely, allowing reliance on extra-contractual statements puts a significant burden on the insurance industry. The resolution of this issue ultimately should be decided by the Texas Supreme Court, and I believe that court has strongly indicated in *Via Net* that extra-contractual statements will not control.

In both Poe & Brown's issue 1 and Transcontinental's issues 3 and 4, the two appellants argue that Omni could not detrimentally rely on either the certificates of insurance or the statements from Sparks that McKnight passed on to Tomes. Both the negligent misrepresentation and DTPA

claims submitted to the jury in questions 1[2] and 3[3] require detrimental reliance. *See Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2002). It has long been the law that a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962). Even a party to a contract must exercise due diligence to protect its own interests. *See Barfield v. Howard M. Smith Co.,* 426 S.W.2d 834, 840 (Tex.1968).

Insurance policies are interpreted according to the rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). If the insurance policy is worded so that it can be given a definite meaning or a certain legal meaning, then the policy is not ambiguous. *Id.* If the policy is not ambiguous, then the court construes the policy as a matter of law. *Id.* No party to this appeal has claimed that the insurance policy is ambiguous, so the issue of whether the insurance policy provided coverage for Omni is one for the court to decide as a matter of law. Here, Omni was not even a party to the insurance contract, yet Omni neither requested a copy of the insurance policy, nor read the certificate of insurance that clearly stated that the certificate could not change the terms of the insurance policy. Tomes, Omni's president, testified that he chose instead to rely on "what we are expecting to get under coverage—the coverage would be what they told us it was."

The supreme court in *Via Net* acknowledged certificates of insurance are of little use if a contracting party must verify them by reviewing the full insurance policy. 211 S.W.3d at 314. Nevertheless, the court proceeded to say that "those who take such certificates at face value do so at their own risk."[4] *Id.* I would hold that

---

2.

**QUESTION NO. 1**

Did one or more of the Defendants make a negligent misrepresentation on which Omni Metals, Inc. justifiably relied?

3.

**QUESTION NO. 3**

Did one or more of the Defendants engage in any unfair or deceptive act or practice that caused damages to Omni Metals? "Unfair or deceptive act or practice" means any of the following:

(1) representing that goods or services had or would have characteristics that they do not have; or

(2) representing that an agreement confers or involves rights that it does not have or involve.

4. *Via Net's* treatment of certificates of insurance was foreshadowed 19 years ago in a dissent by Justice Hecht:

The Court seems to say this: if you pay someone for some kind of insurance and he gives you a card that says you are insured, but you never contact an insurer or an agent and you never see a policy, but you still believe in your heart that you are insured, then you may very well be insured. This Cartesian theory of insurance—"I believe, therefore I am insured"—is not only far-fetched, it is completely unworkable. What are the limits of the coverage the Court thinks [the employee/truck owner] might have? The minimum statutory limits that the card referred to? The limits of [the employer/insured's] policy? The limits [the employee] wishes he had, or that [the injured passenger] hopes he had? What are the terms of this imaginary policy? The standard terms, whatever those are? The terms [the employee] thought he had? At the trial of this case, will the jury be asked to make up some terms and limits and coverages for this made-up policy? Or is it all much simpler? Will the jury simply be asked to award punitive damages against [the insurer] for allowing [the employee] to believe he was insured when he was not? The Court does not attempt to answer any of these questions.

under *Via Net*, Port Metal, the insured, could not rely on the certificate of insurance.

Here, Omni chose to rely only on oral representations, something even a party to a contract cannot do when the oral representation directly contradicts the express, unambiguous terms of a written contract. *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858–59 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (en banc). Tomes not only said he did not request or read the actual insurance contract, but he also said he did not even read the certificates of insurance that were sent to him: "I mean, I'm assuming that what we are expecting to get under coverage—the coverage would be what they told us it was and that, you know, those would just be put in the file for our edification." Tomes's decision not to read the certificates of insurance cannot insulate Omni from the disclaimer on the certificates: "THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS ON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW."

Following the reasoning of *Via Net*, I would hold as a matter of law that Omni could not detrimentally rely on either the certificates of insurance or the oral representations in order to recover on its negligent misrepresentation and DTPA claims. I would, therefore, reverse the judgment of the trial court and render judgment that Omni take nothing.

Finally, I question the use of the law-of-the-case doctrine in this appeal. That doctrine in Texas is defined as that principle under which questions of law decided on appeal *to a court of last resort* will govern the case throughout its subsequent stages. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex.1986). The Fourteenth Court is not a court of last resort. I do not fault the majority, however, because the supreme court has seemingly modified the doctrine without explanation to remove the necessity of an appeal to a court of last resort. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex.2003). If a petition for review is taken to the supreme court, that court should clarify how the law-of-the-case doctrine applies when a previous appeal went no further than the court of appeals.[5]

---

*Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 29 (Tex.1990) (Hecht, J., dissenting, joined by three justices).

**5.** The doctrine may have its roots in the Byzantine history of the appellate jurisdiction of the Texas Supreme Court. *See Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 664–65 (Tex. 2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2767, 174 L.Ed.2d 284 (2009). In any event, no general statute or rule yet requires that appeals which are transferred by the supreme court from one court of appeals to another must return to that same court of appeals on

a subsequent appeal, so the proper application of the law-of-the-case doctrine is an issue of significant importance to appellant practitioners. *See* Tex. Gov't Code Ann. §§ 73.001–.003 (Vernon 2005) (authorizing transfer of cases); Tex.R.App. P. 41.3 (precedent in transferred cases). *But see* 1st Tex.App. (Houston) Loc. R. 1; 14th Tex.App. (Houston) Loc. R. 3 (effective December 7, 2006, requiring related appeals and original proceedings in First and Fourteenth Courts of Appeals to be assigned consistently to single court of appeals).