FILED
15-0423
8/6/2015 8:55:19 AM
tex-6396840
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 15-0423

# JOE MURPHY, YORAM BEN AMRAM and

# GALATEX DEVELOPMENT, LLC.

# V.

# THE CITY OF GALVESTON, TEXAS

On Petition for Review from the Fourteenth Court of Appeals at Houston, Texas, No. No. 14-14-00222-CV

# AMENDED PETITION FOR REVIEW

Mark W. Stevens
TBN 19184300
P.O. Box 8ll8
Galveston, Texas 77553-8118
409.765.6306
Fax 409.765.6469
Email: markwandstev@sbcglobal.net
Counsel for Petitioners  Joe Murphy,
Yoram Ben Amram and Galatex Development LLC

## Identity of the Parties and Counsel

Petitioner Yoram Ben Amram is a citizen of Florida and is represented by trial and appellate counsel Mark W. Stevens. See below.

Petitioner Galatex Development LLC is a Texas Limited Liability Corporation and is represented by trial and appellate counsel Mark W. Stevens. See below.

Petitioner Joe Murphy, now deceased, was a citizen of Texas and resident of Galveston County, Texas . This case is now being prosecuted by his widow and independent executrix, Mrs. Coral Beach. See TRAP 7.1.

Petitioners' Counsel is Mark W. Stevens, Trial and Appellate Counsel for Petitioners, TBN 19184300, PO Box 8118, Galveston, Texas 77553.

Respondent is the City of Galveston, Texas.

Respondent's trial and appellate counsel are David P. Salyer and Jocelyn Holland of the firm of McLeod, Alexander, Powell, & Apffel, PO Box 629, Galveston, Texas 77553.

# Contents

Identity of Parties and Counsel…………………………………………………………….2

Authorities……………………………………………………………………………….3

Statement of the Case……………………………………………………………6

Procedural History………………………………………………………………7

Statement of Jurisdiction……………………………………………….….8

Issues Presented………………………………………………………………...10

Statement on Citations………………………………………………………11

Summary of the Argument—Why This Case is Important…………………….…11

Facts………………………………………………………………………….....12

Argument……………………………………………………………….....…..21

      Conflict with *Obra Homes*………………………………..………………..21

      *Mayhew:* Raw Land vs. Developed Properties……………………………22

      Judicial Endorsement of "Whipsaw" Tactics…………………………24

      Bobbing for Apples—"Tweaking" the  SUP Application…..……………..24

      *Vox Populi*—An Unconstitutional Yardstick……………………………20

      Administrative Appeals: Wormier Apples……………………………...26

      Fact Finding Under Summary Judgment Standards………………….……26

      Letting the "Leverage" Cat Out of the Bag………………………..………29

Conclusion……………………………………………………...………………30

Prayer………………………………………………………………..…………31

Signature……………………………………………………………………...31

Certificate of Compliance…………………………………………………31

Certificate of Service……………………………………………………...31

Tab A—Judgment  of the Court of Appeals

Tab B---Opinion of the Court of Appeals

Tab C—Order of Trial Court Denying Plea To Jurisdiction

# Index of Authorities

## Cases

*Casso v. Brand,* 776 S.W.2d 551 (Tex. 1989)……………………………………….28

*City of Dallas v. Chicory Court Simpson Stuart L.P.,* 271 S.W.3d 412
(Tex. App.—Dallas 2008, no pet.)……………….…………………………….23

*City of Dallas v. Stewart*,  361 SW3d 562 (Tex. 2012)……………....………9, 27

*City of El Paso v. Madero Development,* 803S.W.2d 396
(Tex. App. El Paso 1991), writ denied), *cert. denied,*
502 U.S. 1073 (1992)…………………………………………………………28

*City of Harlingen v. Obra Homes, Inc.,* 2005 WL 74121
(Tex. App.—Corpus Christi 2005, no pet.)……………….…………………8, 21

*Dallas Area Rapid Transit v. Amalgamated Transit Union Local 1338,*
273 S.W.3d 659 (Tex. 2007)…………………………………………….…9

*Hallco Texas, Inc. v. McMullen County,*221 S.W.3d 50 (Tex.
2007)……………………………………………………………….……6 ff.

*In Re City of Galveston*, 14-14-01005-CV (Tex. App. –
Houston [14th Dist. ] March 3, 2015)(original proceeding)………………….23

*Galveston Historical Foundation v. Zoning Board of Adjustment
of the City of Galveston,* 17 S.W.3d 414 (Tex. App.—
Houston[1st Dist.]  2000, no pet.)…………………………………...………………27

*Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex.
1998)……………………………………….…………………....8, 16, 22 ff.

*Monterey v. Del Monte Dunes  at Monterey, Ltd.,* 526 U.S. 687 (1999)………9, 25

*Nollan v. California Coastal Commission,* 483 U.S. 825 (1987)………….……9, 25

*Palazzolo v. Rhode Island,* 563 U.S. 606 (2001)…………..……………..9, 25

*Sheffield Development Company, Inc. v. City of Glenn Heights,*
140 S.W.3d 660 (Tex. 2004)…………………...……………………………8, 26, 29

*Stephen F. Austin State University v. Flynn,* 228 S.W.3d 6533
(Tex. 2007)………………………………………………………………………8

## Statutes & Rules

Texas Local Government Code Sec. 211.008(a)……………………………….27

Texas Local Government Code Sec. 211.011(a)……………………………….27

Texas Government Code Sec. 22.001(a)(2); (a)(6)……………………….....…8

Texas Government Code Sec. 22.225(3)……………………………………...…8

Texas Government Code Sec. 551.071(2)………………………………….....30

Tex. R. App.P. 47.1……………………………………………….………....10

Tex. R. App. P. 47.7(b)……………………………………………………….8

United States Constitution, Amd. V…………………………………………6, 30

Texas Constitution, art. I, Sec. 2………………………………….…………11

Texas Constitution, art. I, Sec. 19…………………………………....……....31

No. 15-0423

JOE MURPHY, YORAM BEN AMRAM and
GALATEX DEVELOPMENT, LLC.

V.

THE CITY OF GALVESTON, TEXAS

**<u>AMENDED PETITION FOR REVIEW</u>**

TO THE HONORALBE SUPREME COURT OF TEXAS:

"This case illustrates how the government can
use the ripeness requirement to whipsaw a
landowner."

*Hallco Texas, Inc. v. McMullen County,*
221 S.W.3d 50, 63 (Tex. 2007)
(Hecht, J., dissenting)

"An out and out plan of extortion."

*Nollan v. California Coastal Commission,*
483 U.S. 825, 837 (1987)(Scallia, J.).

Statement of the Case

This inverse condemnation case demonstrates how "whipsawing" by claims of non-ripeness has reached a high state of refinement, and is now reliable tool for implementing "out and out extortion" in violation of the United States Constitution, Amd. V, and the Texas Constitution, art. I, Sec. 19. A two-building, 14-unit apartment complex in Galveston was forced into foreclosure following Hurricane Ike after City Council made it clear that repair would be allowed if the

owners agreed to destruction 4 of the 14 units to create "green space" which was not required by any statute or ordinance.

## Procedural History

The suit was originally filed in the 10th District Court of Galveston County, Texas, and was removed to the U.S. District Court for the Southern District of Texas, Galveston Division, in Case No. G-12-163. On August 15, 2013, the Hon. John Froeschner, U.S. Magistrate, signed an order staying Petitioners' federal claims and remanding the state claims to the 10th District Court.

Back in State Court, the City filed a motion to dismiss citing lack of "ripeness". The Motion was heard on February 18, 2014, with testimony and exhibits being received by The Hon. Kerry Neves of the 10th District Court of Galveston County, Texas. Judge Neves signed an Order overruling the City's plea to the jurisdiction. Tab C [Murphytabctrialcourtorder].

A timely interlocutory appeal was taken by the City. Following oral arguments, the a panel of the Fourteenth Court of Appeals (Justices Mac Brown as author, McCally and Wise), handed down its Opinion ( --- S.W.3d---, 2015 WL 167178)(Tab B-MurphytabbCAOpinion] and Judgment (Tab A [murphytabaCAJudgment]), reversing in part the Order denying the plea to the jurisdiction and dismissing one of Respondents' claims—a taking based on denial of a Special Use Permit or "SUP"-- on grounds of "ripeness". On March 2, 2015,

7

following grants of extension, a Motion for Rehearing and Rehearing *En Banc* was filed, and was denied on April 23, 2015.

This Petition for Review is timely filed on extension and seeks review of that portion of the Opinion dismissing Petitioners' claim as to the denial of the Special Use Permit (SUP).

Statement of Jurisdiction

This Court has jurisdiction in this interlocutory appeal under Texas Government Code Secs. 22.001(a)(2); 22.001(a)(6) and 22.225 (e), the latter of which was amended in 2013 to read that "conflict" would exist to address inconsistency between decisions which "….should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Stephen F. Austin State University v. Flynn,* 228 S.W.3d 653, 656 nn. 1-3 (Tex. 2007).

More specifically, the Opinion herein(Tab A) conflicts *inter alia* with *City of Harlingen v. Obra Homes, Inc.,* No. 13-02-268-CV, 2005 WL 74121 at *3 (Tex. App.—Corpus Christi, January 13, 2005, no pet.); see, Tex. R. App. P. 47.7(b) effective as to opinions handed down after January 1, 2003.

Further, the Opinion herein conflicts with the following decisions of the Texas Supreme Court:

*Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex. 1998)

8

*Sheffield Development Company, Inc. v. City of Glenn Heights,*
140 S.W.3d 660 (Tex. 2004)

*City of Dallas v. Stewart*, 361 SW3d 562 (Tex. 2012)

Also, under *Dallas Area Rapid Transit v. Amalgamated Transit Union Local 1338*, 273 S.W.3d 659, 665-66 (Tex. 2007), the Opinion conflicts with the following decisions of the United States Supreme Court:

*Nollan v. California Coastal Commission,* U.S. 825 (1987)

*Palazzolo v. Rhode Island,* 563 U.S. 606 (2001)

*Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687 (1999)

## Issues Presented

### Issue 1

Did the Court of Appeals err in holding as a matter of law that Petitioners' "takings" claims under Tex. Const. art. I, sec. 19 and U.S. Const. Amd. V by denial of a Special Use Permit was not "ripe" for adjudication? Opinion at 14.

### Issue 2

Did the Court of Appeals err in holding that no fact question existed on the issue of futility. Opinion at 13

### Issue 3

Did the Court of Appeals err in holding that Petitioners' claim was not "ripe" and thereby depriving Petitioners of a fair and speedy post-deprivation means of protecting federal rights? Opinion at 14.

### Issue 4

Did the Court of Appeals err under TRAP 47.1 in declining to consider or apply City ordinances which addressed Petitioners' right to repair buildings following a natural disaster? Opinion at 8 n. 4, referring to Ordinance Secs. 29-111(a)(4) and 29-111(c)(permitting repair following natural disasters).

### Issue 5

Did the Court of Appeals err in substituting its view of conflicting facts for that of the trial court? Opinion at 14.

### Issue 6

Did the Court of Appeals err in its application of the standard of review for ripeness and futility? Opinion at 12 nn. 9, 10.

The City Council Meeting of February 10, 2011 was transcribed and judicial notice taken at 2 RR 41.  It is referred to below as **CCM**, and is found as an exhibit to the City's Plea to the Jurisdiction, beginning at CR 161.

The District Court hearing of February 18, 2014 is recorded in two volumes, the text being the second volume. Cites to that hearing are given as "**RR**" followed by the page number.

## Summary of the Argument—Why This Case is Important

The doctrine of "Ripeness" is being applied in ways far beyond its intended purpose of preventing  advisory opinions under Texas Constitution, art. I, Sec. 2. Much of the case law in this area deals with the developers of raw land, but the formulas developed and applied in such cases do not address the concerns of the owners of  mortgaged income properties when  confronted with "delay" or "whipsaw" tactics by governmental bodies.   This makes the owners of income properties especially vulnerable, and "ripeness" standards need to be developed— and applied—in a way which  will allow such owners effective access to the courts.  If this is  not done in this case, owners of income properties will be especially susceptible to the predatory scheme demonstrated below.

The full record reveals clandestine intentions of the City to force Petitioners to spend enormous sums repairing an apartment complex  which had already been

marked for confiscation by at least one city council member and certain of her constituents.   In order to lay the foundation for a "ripeness" challenge, the City Council  only hinted at what was demanded—a sacrificial destruction of 4 of the 10 residential units for aesthetic purposes—without ever giving a solid proposal for the landowner to consider. An unguarded admission by the City's former Mayor provided  clear evidence that the City was seeking to "leverage" Petitioners into capitulation by delay and  attrition.

Such tactics will be employed statewide  unless review is granted and the law clarified to protect property rights under State and Federal law.

### Facts

The recital of facts in the Opinion 2-4 is in many ways incomplete , and the more effective method of demonstrating that is to repeat below essentially what was in Petitioners' Brief before the Court of Appeals, and which was entirely within the record.   The pattern confronting Petitioners was one of deliberate successive delays, in the face of a critical post-Ike housing shortage, intended to take the Properties past an imaginary 6 month "vacancy" line that would enable the City—at least in the City's view—to demand an SUP which would never be forthcoming unless one of the buildings was entirely destroyed.

On March 25, 2009, Code Enforcement Officer Wells reported to Debbie Stark of City Planning that 1624/1628 Sealy—the properties in question-- were "Condemned on 1-30-09 and that "all tenants are out." PX-2 . Contrary to the City's later position as to "vacancy", in the same email Ms. Wells reported that a different property at 1106 M in Galveston was *"…not abandoned because there is steady work being done."* (PX-2, final paragraph).

On May 18, 2009, Sarah Gandy emailed to Ron Penn (City Inspector) with copies to numerous persons including K. Wells and Council member Elizabeth Beeton*:*

> *"I implore you to do all that is in your power to enforce the codes and regulations against this absentee owner. He is an Israeli citizen living in Miami who has seen this property only once for approximately 8 minutes. He seems to think that Galveston is an easy place to make a quick buck at the expense of local taxpayers."*

PX-3.

On May 20, 2009 Mrs. Gandy emailed a complaint to Council Member Beeton complaining that "historical" doors had not been replaced and apparently were being resurfaced. That email was copied to Wendy O'Donohoe, City Manager Steve LeBlanc and Lance Gandy, among others. See PX 4 . Mr. Ben Amram reinstalled the original (i.e., "historic") doors, paying a $100 per door fine to placate the City.

On May 21, 2009, Wendy O'Donohoe (Planning Director) emailed to Ms. Wells and William Plummer (City Inspectors) with copies to Debbie Stark and David Ewald, both of City Planning, forwarding May 20 email of Mrs. Gandy and giving directions to "red tag" the property, i.e., halt constructions. ("If it is necessary to file charges at this point, please move forward as soon as possible.") See PX-4..

On May 26,2009, Ms. Wells informed Mrs. Gandy that the property has been "red tagged" and that City personnel has informed the owner that the "original [historic] doors would have to be put back up." She further advised that, "…as of today the original doors have been returned and put back up" and that the doors are boarded to prevent vandalism, and that the work could now resume." PX – 15 . Undeterred, Mrs. Gandy almost immediately (4:46 p.m. to 4:59 pm) emailed Ms. Wells, asking about previous supposed complaints (electrical, mold, construction debris, etc.) PX 15.

On September 29, 2009 Ms. Gandy emailed Ms. Wellsabout "broader planning issues with the property—parking, green space, life safety, etc." *Id.* In the same email Ms. Gandy then raised the issue of a **possible six-month vacancy tactic**:

> "If the roof, windows, and other issues do not get repaired quickly and the age of the permit is past 6 months, what happens? Does it ever expire?

14

PX-9.

On December 19, 2009 Council Member Beeton noted that "Coral Beach" (the apartments) is "…advertising that it is ready to receive tenants again." PX-9 This news was ill received by Council Member Beeton, who then asked:

> "*It is located in the East End Historical District but it does not meet the standards for the District. Has it lost its grandfathered status since it has not been **operational** for more than six months?"*

PX-7[emphasis added].

In a string of emails of **December 21, 2009** , Wendy O'Donohoe—perturbed that the properties might actually be renting-- asked "When was downstairs released?" Further, "What were details of previous agreement". She further asked about "any issues, historical significance, etc.? PX-8, second page.

In the same email string, Ron Penn of Planning advises that an earlier agreement (which he dates as 12/17 instead of November 17) was "verbal" but that "confirmation is being faxed today" and further that "Conditions state lower floor only" and that "any occupancy of upper floors without inspection and approval will result in charges being filed in municipal court and condemnation of entire property." PX-8.

On December 21, 2009, PX-9, , Ms. Wells advised the local property manager by letter that *"per our conversation on November 17, 2009, the*

*condemnation has been lifted only on the lower level apartments of both addresses. Renting of the upper level apartments will result in charges filed with the Municipal court...and condemnation of the entire complex...."* Ben Amram had made substantial progress on the lower units, flooded by Ike—but the City would continue to "flyspeck" the project as to the second story units—which had not been affected by Ike at all.

On December 23, 2009, PX 10 , Ben Amram emailed Ron Penn that he wanted the project done "100%" and stated that all except the "back stairs" had been done. He noted that electrical and plumbing permits are "closed" (i.e., work completed) and that he has an open building permit because his contractor was waiting for removal of the "condemnation." He asked for help in closing out the 2009 permits. A similar email was sent on December 31, 2009, advising that " the City inspector approved the building." PX 11 .

The City backpedaled-- in high gear. On January 19, 2010, [Tab 12], Ron Penn emailed Ben Amram with list of **additional** items to be repaired, showing as 15 attachments. Ben Amram responded: "…Until only two weeks ago, many of these items where [sic] never presented to us as violations and were not on any list of requests. Some of these items had been addressed already…." Id.

On **January 25, 2010** PX 14, Ben Amram emailed Mr. Penn advising of progress and addressing all previous concerns. That would not do. On **January**

**28, 2010** Kandelle Wells forwarded Ben Amram's email of January 25 to Debbie Stark in Planning. She then PX-13 emailed Ron Penn and Debbie Stark at City Planning, raising the following "issues" apparently for the first time:

--City wanted an engineer's letter;

--Questioned whether the heating will be adequate to meet a 68 degree F. requirement;

--"All bathtubs, sinks and lavatories" will be maintained in a "safe and sanitary manner, free from "defects" and leaks.

--Questioned whether 60 watt bulbs are being used;

--Requireed "luminaires" in all spaces.

--Requires exterior walls to be free from holes, etc. etc. etc.

On January 25, 2010 PX-14, Ben Amram advised that 1624 Sealy will be ready for an inspection on Monday.

That wasn't good enough. On February 4, 2010, PX-15 , Ms. Wells advised that an inspection on February 2 revealed that 1624 Sealy was "not ready for human habitation" because:

--a light fixture (pictured) is not up to electrical code;

--Stairs must be repaired or replaced before condemnation can be lifted, noting that a permit was issued on the previous day, February 3

Ms. Wells' unqualified to make any determination about the supposed inadequacy of heating or air conditioning.. She was not trained in heating technology; she could not say ("I don't remember") what the source as of her "belief" that the units were inadequate; and that she wasn't actually saying that the heater was inadequate, but only that it "might" be inadequate. See Deposition extract read into evidence at 2 RR 63. Her requirement of "testing" the units on a cold day was unlikely to occur for many months, since the requirement was announced in February. 2 RR 63-64.

March 23, 2010 Ben Amram emailed Wells, advising that the stairway and electrical code issues will be fixed "in the next few days" so that the city "…can lift the condemnation per your previous inspection and discussion." PX-17 ..

<u>Setting The Six Month "Vacancy" Trap</u>

On March 26, 2010 PX-18 Second Page, Council Member Beeton emailed City Attorney Susie Green and Wendy O'Donohoe:

> "If a structure such as this is not in compliance with the standards in place in the historical district and it is substantially damaged, don't they have to come into compliance when they rebuild? In addition, has been out of operation for over 6 months so its grandfathering would have lapsed."

On April 7, 2010 (PX-18 final page) Wendy O'Donohoe emailed numerous members of "Staff" and called for a meeting on the subject property, mentioning "a few emails from CM Beeton w/Questions".

18

On April 11, 2010 Ben Amram emailed Ms. Wells with copies to Ron Penn and William Plummer, advising that "your requested replacements and work on 1624 is no[w] completely done", requesting a removal of condemnation and calling for an inspection. PX 19.   That email was forwarded  to Wendy O'Donohoe with importance category "high."  PX 8.

On April 26, 2010 (PX 20)  Lori Schwartz (City Historical Director) emailed Wells with copies to Wendy O'Donohoe and Debbie Stark:

"As a reminder, I need the email regarding the condemnation of the structure and the cease in land use at these locations as soon as possible. Please send me a summary of the code enforcement activities first thing on Tuesday morning."

On May 3, 2010, Ms. Wells emailed Debbie Stark: *"Have we heard anything yet from legal re: the above addresses and the non-conforming use of them...Whether or not they'll be able to **operate**?"* PX-22 .

May 4, 2010 PX-23  at   8:55 am Wendy O'Donohe emailed Penn, Stark, Wells and Lori Schwartz asking *"can everyone be available at 1:30 today to discuss this property?"* About 15 minutes later, at 9:11 am, Wells replied, *"Yes, ma'am!  Thanks."*

On May 4,  2010, PX-24 Ms.  Wells emailed  to Lori Schwarz a **draft** of an email proposed to be sent to Mr. Ben Amram.  The draft email **for the first time** would invoke Zoning Standards Section 29-111(a)(4), the so-called six month provision. The draft email of May 4 recites that "…the Planning Division has

reviewed the land use with the City Attorney's office and has determined that the properties ….are now in violation of Section 29-111 of the Zoning Standards." According to the City's "interpretation", this would require a "Special Use Permit" before the properties could be operated as an apartment or even occupied by more than two families.

Springing the Trap

Yoram Ben Amram was **not even then** told by the City of the supposed "six month vacancy" issue. On May 10,2010 Joe Murphy visited the City Planning office and was informed *for the first time* that the City was invoking the "six month" provision and require an Special Use Permit, or SUP, for multi-family operation. Murphy testimony, 2 RR 105.

The Opinion at 8, n. 4, bypassed Sec. 29-111(d), PX-46, which demonstrates that the city's "parking" condition was merely camouflage for a ruinous reduction in "density"—4 units out of 14 of the heavily mortgaged Property. Sec.29-111(d) states:

> The failure of an **existing** structure, property or business to comply with the area standards for yards, lot area, open space coverage, height **or vehicle parking** shall be interpreted as a non-conformity of structure, but such non-conformity shall not be a basis for refusal of a permit to alter, improve or reconstruct such existing structure, property or business so long as such alteration, improvement or reconstruction does not increase the degree of non-conformity existing prior to such action (Ord. 02-018) [emphasis added].

20

It is important to note that Council's concern for "trash" etc. was entirely independent of the SUP. See CCM, p. 7:

> CM Greenberg: So nothing, even if you did this, an SUP it would be subject to coming up to code on everything.
> O'Donohoe: Correct.

Thus, those issues were "red herrings." The real issue was the SUP.

Argument

Conflict with <em>Obra Homes</em>

The Opinion at p. 8 frames the case in terms of whether the SUP denial constituted a *"final decision such that we know to a reasonable degree of certainty the extent of permitted usage of the property"*. However,the Opinion at 14 n. 10 acknowledges the contrary approach taken in *City of Harlingen v. Obra Homes, Inc.,* 2005 WL 74121 at *3 (Tex. App.—Corpus Christi 2005, no pet.)(mem. Op.), with which it conflicts. *Obra Hom*es recognized that there comes a point when municipal inaction-- or chicanery-- can make further efforts and expense futile.

A property owner aware of *Obra Homes* and the Opinion below cannot determine what his options are. A city or other governmental unit may invoke the Opinion below, now published, to force an owner into a war of attrition until the process becomes so expensive that the owner capitulates or suffers serious losses due to the delay. The Opinion will exert a chilling effect on many owners at the

outset of disputes, giving a systemic and unconstitutional advantage to governmental bodies.

*Mayhew:* Raw Land vs. Developed Properties

Beginning at p. 6 the Opinion seeks to distinguish *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex. 1998). There occurred the first and most fundamental analytical error. *Mayhew,* like most other cases in this field, involved **undeveloped** land, which almost always has residual, if disappointing, value. There was nothing "hypothetical" or "theoretical" about Petitioners' loss. The actions of the City unquestionably destroyed a valuable property, ultimately bringing about a foreclosure and later sale at a "dirt" price. Murphy testimony, RR 110/2 (Sale after foreclosure for $55,000).

Historical uses of the property are critically important in assessing the reasonable investment backed expectations of the owner. *Mayhew,* 964 S.W.2d at 937. The buildings in this case had stood and been in operation for 50 years in the case of one structure (4 apartments), and nearly 100 years for the larger building (10 units). CCM, p. 10.

Speculators in raw land always risk the possibility of delay in approval of plans, but investors with mortgages on existing income properties do not. Petitioners did not have the luxury of waiting years to "tweak" with various

proposals (suggestion of Mayor Jaworksi,  at Opinion 12) until they satisfied the

amorphous demands of various council members.   At 12 n. 8, the Opinion

concedes that a "tweak" might include a reduction in density, i.e., a reduction of

units that had been operating –and which were critically needed following

Hurricane "Ike".

Council Member  Beeton  *knew*  and effectively conveyed that she was after

a ruinous alternation when she suggested that Ben Amram and his mortgagor to

jointly take a what some call a "haircut",  CCM 78:

> ….I think this could be a successful property in this neighborhood if it were properly repaired and managed. I do believe it would be much more likely to be successful if the new building that was wedged into what used to be the courtyard there was **removed**. And that would leave ten units, there would be some green space…And I would really like to encourage Mr. Ben Amram **and his lien holder Mr. Murphy** to give some thought to an approach like that.

[Emphasis added].  The "new" building had been "wedged" into the property about

50 years before.  CCM, p. 10. To Ms. Beeton, "successful" obviously  meant

destruction of part of the property to create "green space", and without any

compensation.  The City had no right to demand such an exaction under  the State

and Federal Constitutions.

In attempting to distinguish *Mayhew*, the Opinion at  10  first cited *City of

Dallas v. Chicory Court Simpson Stuart L.P.,* 271 S.W.3d 412, 421-22 (Tex.

App.—Dallas 2008, no pet.). *Chicory Court* also involved  raw land.  The owner

"…essentially acquiesced in the City's preference for a completely underground sewer system" 271 S.W.3d at 421-22 . In the present case, Petitioners' "plan" was simply to repair the property like everybody else in the wake of "Ike."

### Judicial Approval of "Whipsaw" Tactics

The Opinion at 11 actually ***endorsed*** the "whipsaw" tactics of the City, stating that the "…this [Landmark] commissioner also noted that Ben Amram could chose to 'come back with another application that was less dense '" and suggesting that Ben Amram was "unwilling" to do that. Ben Amram was in fact **unable** to do so because such an exaction would ruin him. RR 75-76.

"The ripeness doctrine does not require a property owner…to seek permits for development that the property owner does not deem economically viable. *Mayhew*, supra, at 932. Such language may be problematic in "raw land" cases, but it is critical when dealing with income properties. In this case, and given the events since "Ike", Ben Amram could never be sure-- or even confident-- that his repairs would fully satisfy the City inspectors, and even then had every reason to believe that an SUP would be not be granted without unless he destroyed some of the units—or an entire building-- that he had just "repaired."

### Bobbing for Apples—"Tweaking" the SUP Application

The suggestion by Mayor Jaworski, CCM 84, Opinion at 12, that Ben Amram might reapply later with a "tweaked" SUP application was an invitation to go bobbing for apples without any chance of getting a real bite. *Hallco , supra,* 221 S.W.3d at 63-64, 72 (Hecht, J., dissenting).

Such official vacillation was critical—and condemned-- in *Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 698 (1999), where the Court observed that when that council denied a developer's plan they "…not only declin[ed] to specify measures the landowners could take to satisfy the concerns raised by the counsel but also refus[ed] to extend conditional use permit to allow time to address those concerns." *Monterey*, at 697.

In *Palazzolo v. Rhode Island,* 563 U.S. 606 (2001), the Supreme Court faced a situation in which a developer of raw land was being in effect "whipsawed" by a state regulation scheme:

> Government authorities, of course, may not burden property by the imposition of repetitive or unfair land use procedures in order to avoid a final decision.

*Palazollo, supra,* 563 U.S. at 621, citing *Monterrey v. Del Monte Dunes at Monterrey, Ltd.,* 526 U.S. 687, 698 (1999).

Similarly, in *Nollan v. California Coastal Commission,* 483 U.S. 825, 837 (1987), the Supreme Court held that a requirement that landowners grant a public

easement across their land as a condition of receiving a building permit was unconstitutional, characterizing it as "an out-and-out plan of extortion."

<em>Vox Populi</em>—An Unconstitutional Yardstick

The Opinion 11 n. 6 then noted that "several" of Ben Amram's neighbors spoke, consistently requesting denial of the application, and further notes that those neighbors "had been in contact with the City to complaint about the property during the renovation."

Indeed they did! In fact, two of them, Mr. and Mrs. Gandy, were trying to buy the property at a "dirt" price of $55,000. Lance Gandy stated that he wanted to "reduce the occupancy" and to remove the brick four-plex. RR 107/14. Gandy said that he "didn't care" if such actions would bankrupt Mr. Ben Amram. RR 107/19. Gandy made an offer with an earnest money contract to buy the property and seek a demolition permit. As of the date of Gandy's contract, Murphy had already foreclosed on the property. RR 108/25.Gandy backed out of the contract, however. The price on Gandy's proposed contract was **$55,000**. RR 108/1-12, i.e., "value of the land only." RR 108/19.

"…[A] strong public desire….is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Sheffield Development Company, Inc. v. City of Glenn Heights,* 140 S.W.3d 660, 670 (Tex. 2004).

## Administrative Appeals: Wormier Apples

The suggestion at Opinion 13 that Ben Amram should have resorted to the Zoning Board of Adjustment conflicts with *City of Dallas v. Stewart*, 361 SW3d 562 (Tex. 2012). The Zoning Board of Adjustments (ZBA) is precisely the type of body referred to in *Stewart,* i.e., incompetent to adjudicate constitutional matters of property rights:

> The protection of property rights, central to the functioning of our society, should not—indeed, cannot—be charged to the same people who seek to take those rights away.

*Stewart, supra,* at p. 580.

The Zoning Board of Adjustments was created under Texas Local Government Code Sec. 211.008(a), which provides that the "governing body"—i.e., City Council—appoints the ZBA members. Even if the ZBA ruled in favor of Ben Amram, the City itself or any "person aggrieved" could appeal the ZBA to the District Court, under Texas Local Government Code Sec. 211.011(a). A "person aggrieved" would include local historical preservation groups. See, e.g., *Galveston Historical Foundation v. Zoning Board of Adjustment of the City of Galveston,* 17 S.W.3d 414 (Tex. App.—Houston[1st Dist.] 2000, no pet.). At the City Council Meeting, a letter was read into the record by the "East End Historical

District Association", opposing the grant of an SUP.  CCM 56/12.  Appealing to the ZBA would merely invite further delay, amplifying and reinforcing  the City's contrived " whipsaw".

<u>Fact Finding Under Summary Judgment Standards</u>

At 12, n. 8, the Opinion correctly stated the standard of review was essentially the same as for summary judgment.  However,  the Opinion then discounted  the comments of various City Council Members  cited by Petitioners, but apparently accepted whole cloth—or at least credited-- their claims of good faith, e.g. "openness" to multifamily operations in the East End Historical Zone.

At that point, the Opinion was improperly *weighing evidence* in violation of the standard of review under summary judgment principles,  and in so doing conflicts  with *Sheffield* :

> But the takings provision of the Texas Constitution would suffer a huge loophole if we were required to presume that a city's endless refusal to permit a landowner the reasonable use of his property was justified by an honest disagreement of council members.

*Sheffield, supra*, 140 S.W.3d at 680.

While individual council members cannot speak for the entire body, Opinion at 12,  n. 9, citing *City of El Paso v. Madero Development,* 803S.W.2d 396, 401 (Tex. App. El Paso 1991), writ denied), *cert. denied,* 502 U.S. 1073 (1992), it does not follow that such statements can establish any fact, or the ultimate conclusion of

a lack of ripeness. A claim of one's future intent or state of mind ordinarily presents a fact issue. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989).

<u>Letting the "Leverage" Cat Out of the Bag</u>

At the outset of this Petition, it was suggested that "whipsawing" has been elevated to something of an Art Form since Justice Hecht's Hallco dissent in 2007. What follows illustrates just how skillfully that technique has been crafted.

Petitioners suggest that the statements of council members relied upon by the Court below were choreographed in the "executive" session as deliberate means of salting the record with self serving claims of "good faith" to defend an anticipated claim on grounds of lack of ripeness.

There was in the record unmistakable evidence that this happened. The Council meeting was preceded by an "executive" session. At the Council Meeting, CCM 88, Mayor Jaworski made this remarkably unguarded comment:

> **…We were talking about leverage to affect change in certain things in our executive session. I don't think I'm giving away anything there.**

But the Mayor **was** giving away something that was critical in this case, and disturbing more generally. The City was clearly seeking the "leverage" of delay—a tactic denounced in *Sheffield Development Company, Inc. v. City of*

*Glenn Heights,* 140 S.W.3d 660, 680, 688 (Tex. 2004)("… but the use of delay for extortion is hardly a legitimate governmental function.").

Texas courts should be reminded that "ripeness" claims in land use cases involve public bodies and thus will inevitably involve potential violation of the Texas Open Meetings Act. Legitimate reasons for calling an executive session do not include woodshedding council members on how to posture in open session on the law of "takings". This is not a theoretical concern, in Galveston or elsewhere. *See, In Re City of Galveston*, 14-14-01005-CV (Tex. App. –Houston [14[th] Dist. ] March 3, 2015)(original proceeding), where a panel of the same court of appeals below very recently directed a District Judge in Galveston County to consider in more detail which topics were discussed in executive session under Texas Government Code Sec. 551.071(2)(legal consultation), noting that proper use of that provision required direct discussions of specific questions for counsel.

## Conclusion

Mayor Jaworski at least got one thing right: *"Money can make any property nicer."* Opinion at 12. The issue is whether that money must be the City's or the owners'. Where cities seek to conduct "urban renewal" by coercing landowners into foreclosure or distress sales, it must be the City's money. Tex. Const. art. I, Sec. 19; U.S. Const., Amd. V.

## Prayer

Petitioners pray that review be granted and that upon full hearing the Judgment of the Court of Appeals be reversed insofar as it rendered any judgment, and that this case remanded for trial on the merits.

Respectfully submitted,

*/s/Mark W. Stevens*

Mark W. Stevens
TBN 19184300
PO Box 8118
Galveston, Texas 77553
409.765.6306
Fax 409.765.6469
Email: markwandstev@sbcglobal.net
Counsel for Appellees

## Certificate of Compliance

The applicable portions of the forgoing Petitioner contain 4,393 words in Times New Roman 14 point, double spaced.

*/s/Mark W. Stevens*

Mark W. Stevens

## Certificate of Service

A true and correct copy of the foregoing instrument has been served upon Mr. David P. Salyer and Ms. Jocylen Holland, McLeod, Alexander, Powel & Apffel via electronic means on August 7, 2015, **Amending the Petition for Review filed on August 6, 2015.**

*/s/Mark W. Stevens*

Mark W. Stevens



# JUDGMENT

## The Fourteenth Court of Appeals

THE CITY OF GALVESTON, TEXAS, Appellant

NO. 14-14-00222-CV                 V.

JOE MURPHY, YORAM BEN-AMRAM, AND GALTEX DEVELOPMENT, LLC, Appellees

_____

This cause, an interlocutory appeal from the order denying appellant City of Galveston's motion to dismiss for lack of subject-matter jurisdiction, in favor of appellees, Joe Murphy, Yoram Ben-Amram, and Galtex Development, LLC, signed February 28, 2014, was heard on the transcript of the record. We have inspected the record and find the trial court erred in failing to grant the motion in part. We therefore order that the order that denied the City's motion to dismiss with regard to appellees' takings claims based on the City's denial of appellees' Special Use Permit is **REVERSED** in part and **RENDER** judgment dismissing such claims.

Further, we order that the order is **AFFIRMED** in part with regard to appellees' takings claims based on the City's revocation of the property at issue's grandfathered non-conforming status.

We order that each party shall pay its costs by reason of this appeal.

We further order this decision certified below for observance.

**Affirmed in Part, Reversed and Rendered in Part, and Opinion filed January 13, 2015.**



In the

# Fourteenth Court of Appeals

## NO. 14-14-00222-CV

### THE CITY OF GALVESTON, TEXAS, Appellant

### V.

### JOE MURPHY, YORAM BEN-AMRAM, AND GALTEX DEVELOPMENT, LLC, Appellees

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 12-CV-0907**

## O P I N I O N

Appellees Joe Murphy, Yoram Ben-Amram, and Galtex Development, LLC[1] sued the City of Galveston, claiming that the City unconstitutionally took their property without just compensation through inverse condemnation. The City filed a plea to the jurisdiction, which the trial court denied. The City timely filed this

---

[1] We refer to the appellees collectively as the "Property Owners."

interlocutory appeal, asserting that the trial court lacked subject-matter jurisdiction because the Property Owners' claims are not ripe for review. We affirm in part, and reverse and render in part a judgment of dismissal.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

At the time of the claims, Ben-Amram d/b/a Galtex owned the property at issue, subject to a mortgage held by Murphy. The property—consisting of two buildings built in 1910 and approximately 1955-1965, respectively—is located in Galveston, Texas, on Sealy Street, in the East End Historical District. Although the Historical District is zoned for single-family dwellings, the property was categorized and operated as "multiple-family dwellings," comprising a total of 14 rental units.

On September 13, 2008, Hurricane Ike struck Galveston Island and flooded the first floors of the property. Repairs began in January 2009. On January 30, 2009, the City advised Galtex that the property was "unfit" for human habitation and had been "condemned." The tenants evacuated. Ben-Amram and Galtex pulled permits and began renovations. In May 2009, the City "red tagged" one of the buildings for lack of compliance with the Historical Code and requested mold remediation and moisture reports. Renovations continued. The condemnation as to the lower floors was lifted in November 2009 but was reinstated in December 2009 after an inspection. In January 2010, City inspectors indicated that the condemnation would be lifted if various code items were completed and a letter from a certified engineer attesting to the property's safety was provided.

Over the next few months, Ben-Amram met and communicated with City inspectors regarding these and additional requested items. In May 2010, City officials for the first time informed the Property Owners that, because the property had been unoccupied for over six months, it had lost its "grandfathered" non-

2

conforming status and would require a Specific Use Permit (SUP)[2] to be occupied as multi-family dwellings.

In December 2010, Ben-Amram submitted the SUP application to the City. He also submitted copies of the application to the Landmark and Planning Commissions for review and recommendation. In January 2011, Ben-Amram's and Galtex's engineer recommended certain brick work. The additional brick work commenced. Later in January 2011, both the Landmark and Planning Commissions recommended denial of the SUP application. City staff recommended approval, subject to meeting specified conditions, including meeting all compliance requirements necessary to lift the condemnation, and providing more parking spaces or requesting a variance.

City Council heard the Property Owners' request for a SUP on February 10, 2011, and denied the request. Murphy foreclosed on the property in October 2011. In April 2012, the Property Owners filed suit against the City, alleging that the SUP denial, as well as the City's "purported" invocation of the six-month vacancy used to then require the SUP, constituted a regulatory taking under both the Texas and federal constitutions.

The City filed a motion to dismiss for lack of subject-matter jurisdiction. The City argued that the Property Owners' claims were not ripe because there was no final or definitive decision regarding use of the property as multi-family dwellings. The City attached evidence consisting of Ben-Amram's deposition transcript and exhibits, and the relevant excerpt from the February 2011 City Council public hearing. The Property Owners filed a response.

---

[2] The parties also refer to the SUP as a "special use permit."

On February 18, 2014, the trial court held an evidentiary hearing. The Property Owners presented three live witnesses: City Councilmember Beeton, Ben-Amram, and Murphy. The Property Owners also read excerpts from the depositions of two City officials and offered exhibits. On February 28, 2014, the trial court signed an order denying the City's motion to dismiss. The City timely filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (West 2011).

## II. ANALYSIS

### A. Standard of review

We review the trial court's ruling on a plea to the jurisdiction under a de novo standard. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).[3] Where, as here, the plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court considers relevant evidence submitted by the parties. *Id.* at 227. If the evidence creates a fact question regarding jurisdiction, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id.* at 227–28. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

"[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). . . . By requiring the [governmental entity] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to put on their case simply to establish jurisdiction." *Id.* (internal quotation marks and citation omitted); *accord Dallas Cnty. v. Wadley*,

---

[3] While the usual procedural vehicle to challenge the sufficiency of the pleader's jurisdictional allegations or the existence of jurisdictional facts is a plea to the jurisdiction, the City's motion to dismiss here functioned as a plea to the jurisdiction. *See Drexel Corp. v. Edgewood Dev., Ltd.*, 417 S.W.3d 672, 674 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

168 S.W.3d 373, 377 (Tex. App.—Dallas 2005, pet. denied).

Under this standard, we credit as true all evidence favoring the nonmovant and draw all reasonable inferences and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. The movant must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant discharges this burden, the nonmovant then must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *See Miranda*, 133 S.W.3d at 228.

## B. Inverse condemnation

Article I, section 17, of the Texas Constitution, the "takings clause," mandates that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, § 17. Similarly, the Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V; *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 645–46 (Tex. 2004) (violation of Just Compensation Clause may be brought under 42 U.S.C. § 1983).

When a governmental entity intentionally takes private property for public use without adequately compensating the landowner, "the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004). To assert inverse condemnation, a claimant must plead: (1) the governmental unit intentionally performed an act (2) that resulted in the taking, damaging, or destruction of the claimant's property (3) for public use. *See Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.

5

2001); *Kirby Lake Dev. v. Clear Lake City Water*, 321 S.W.3d 1, 5 (Tex. App.—Houston [14th Dist.] 2008), *aff'd*, 320 S.W.3d 829 (Tex. 2010). Takings can be classified as either physical or regulatory. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). While all property is held subject to the valid exercise of the police power, a regulatory action may, under some circumstances, constitute a taking requiring compensation. *See Hallco Tex., Inc. v. McMullen Cnty.*, 221 S.W.3d 50, 56 (Tex. 2006).

Here, the Property Owners allege a regulatory taking that denied all economically beneficial or productive use of the property or, in the alternative, unreasonably interfered with the use and enjoyment of the property. *See id.*

## C. Ripeness

Ripeness is an element of subject-matter jurisdiction and, as such, is subject to de novo review. *Mayhew*, 964 S.W.2d at 928–29. "A controversy is 'ripe' for the courts when it has 'legally matured.'" *City of Paris v. Abbott*, 360 S.W.3d 567, 578 (Tex. App.—Texarkana 2011, pet. denied). A regulatory takings claim ordinarily is not ripe until there has been a "final and authoritative determination" by the governmental entity applying the regulations at issue to the property. *Mayhew*, 964 S.W.2d at 929; *see Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). This is because "a court cannot determine whether a taking or other constitutional violation has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property." *Mayhew*, 964 S.W.2d at 929; *see Hallco*, 221 S.W.3d at 70 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.'" (quoting *MacDonald, Sommer & Frates v. Cnty. of Yolo*, 477 U.S. 340, 348 (1986)).

6

A final decision usually requires both a rejected development plan and the denial of a variance from the controlling regulations. *Mayhew*, 964 S.W.2d at 929. Failure to reapply or seek a variance ordinarily is fatal to the ripeness of claims. *Id.* at 931. When a general zoning or land-use restriction is subject to discretionary application or variance, "the impact on a particular property may not be ripe until a variance is finally denied." *Hallco*, 221 S.W.3d at 60. Such variance requirement is applied flexibly to serve its purpose of giving the governmental entity an opportunity to grant alternate forms of relief or make policy decisions that might abate the alleged taking. *Mayhew*, 964 S.W.2d at 930. However, futile reapplications or variance requests are not required. *Id.* at 929. Property owners are not required to seek permits for developments that the "property owner does not deem economically viable." *Id.* at 932.

The City contends that the Property Owners' claims are not ripe because they never obtained a final decision regarding their use of the property as an apartment complex. According to the City, its denial of the SUP primarily was based on code safety and structural concerns with the property, including the lack of the engineer's letter. In other words, the decision was not final as City Council encouraged Ben-Amram to bring the property within compliance, submit the engineer's letter, and reapply; however, he did not reapply. The City also asserts that with regard to the parking concern, Ben-Amram had the option of seeking a variance on the parking requirement from the Zoning Board of Adjustment and did not.

The Property Owners respond that their case is ripe. In particular, the Property Owners contend the record contradicts the City's position that the SUP application was denied due to safety concerns. The Property Owners also argue that the City Council hearing was a "sham" designed to wear them down into

7

acquiescing to demands for density reduction, and that "[a]ny efforts by Ben[-] Amram to make further applications of any kind would be futile."[4]

### 1. Evidence pertaining to ripeness of denial of SUP application

While a landowner must give the land-use authority an opportunity to exercise its discretion, a takings claim likely will have ripened once it becomes clear that the governmental entity lacks the discretion to permit the requested usage, or the permissible uses of the property are known to a "reasonable degree of certainty." *See Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001). Here, City Council had the discretion to grant the Property Owners' SUP application, despite the commissions' recommendations. Therefore, the key question is whether the City's denial of the SUP constituted a final decision such that we know to a reasonable degree of certainty the extent of permitted usage of the property. *See MacDonald*, 477 U.S. at 348–49, 351. We conclude that it does not.

We begin our discussion with *Mayhew*, with which the Property Owners align and which the City attempts to distinguish. The Mayhews complained that the town's refusal to approve their planned development constituted a taking. 964 S.W.2d. at 926. After reiterating that the concept of ripeness requiring final decisions is usually signified by rejected development plans and variance denials, the *Mayhew* court highlighted the exception that "futile variance requests or re-applications are not required," and ruled that any further actions would have been

---

[4] In addition, the Property Owners essentially argue that the City conjured up the illegal SUP requirement in order to force them to reduce the number of rental units. They contend that the City improperly relied on the zoning standards—Ordinance Section 29-111(a)(4)—to revoke the property's non-conforming status and require the SUP. Instead, according to the Property Owners, a different section of the code—Ordinance Section 29-111(c)—governs, which permits reconstruction on non-conforming structures after a natural disaster. The Property Owners also argue that any additional parking requirement conflicted with Ordinance Section 29-111(d). We need not reach the construction of these ordinances in order to review the trial court's ruling on the plea. *See* Tex. R. App. P. 47.1.

8

futile, even though the Mayhews did not file another application and failed to apply for a variance. *Id.* at 929, 931. The ruling, however, was limited to the "unique circumstances" of that case. *Id.* at 932.

In that case, the Mayhews owned several hundred acres of land which they hoped to develop, but were confronted by an ordinance prohibiting planned developments with densities in excess of one dwelling unit per acre. *Id.* at 925. The Mayhews met with the town, which amended the ordinance to allow development in excess of the limit, with council approval. *Id.* at 926. After spending half a million dollars for studies and the preparation of evaluative reports, the Mayhews submitted their planned development proposal to the town. *Id.* If approved, the Mayhews planned to sell the property to a third party for development. *Id.* However, the third party would only develop the property if it could build a minimum of 3,600 housing units. *Id.* Thus, the Mayhews sought approval to build 3,650 to 5,025 units. *Id.* After four months of consideration, the town's planning and zoning commission recommended denial of the application. *Id.* The town council next appointed a negotiating committee, which met with the Mayhews and agreed to a compromise development of 3,600 units, the minimum number of units needed for the third party to purchase the property for development purposes. *Id.* At a subsequent meeting of the town council, the council was informed that approval for less than 3,600 units would be considered an outright denial. *Id.* Despite the prior compromise with the negotiating committee, the town council voted to deny the development. *Id.* A meeting to reconsider the vote was later cancelled by the town. *Id.* Instead of reapplying or applying for a variance, the Mayhews filed suit. *Id.* at 931.

The *Mayhew* Court observed that "[n]ormally, their failure to reapply or seek a variance would be fatal to the ripeness of their claims." *Id.* (citing

9

*MacDonald*, 477 U.S. at 351; *Hamilton Bank*, 473 U.S. at 188–91). However, because the "evidence in this case establishe[d] the extent to which the Mayhews worked with the [t]own in attempting to have their development approved"— spending $500,000, engaging in negotiations with the town for over a year, compromising with a negotiating committee after an initial negative response from the town's planning and zoning committee, suffering a rejection of their amended development plan application, and cancellation of reconsideration of the town council's vote—the Texas Supreme Court held that any further applications would have been futile and that the Mayhews' claims were ripe. *Id.*

In *Mayhew*, despite the Mayhews' submission of only one application and not applying for any variances, there was a reasonable degree of certainty that the town council would not grant any further reapplication or variance involving any development plan of 3,600 units or more. In contrast, the evidence here establishes that the Property Owners did not obtain a final decision as defined by *Mayhew* on their SUP application for a 14-unit dwelling.[5] *See City of Dallas v. Chicory Court Simpson Stuart, L.P.*, 271 S.W.3d 412, 421–22, 424 (Tex. App.—Dallas 2008, pet. denied) (distinguishing *Mayhew* and reversing denial of plea to jurisdiction where landowner obtained rejection of single drainage plan and never submitted additional alternative plan, despite city's indication it would consider one if landowner chose to submit one).

---

[5] The Property Owners also cite *City of Sherman v. Wayne*, 266 S.W.3d 34 (Tex. App.— Dallas 2008, no pet.). However, *Wayne* is distinguishable where Wayne negotiated with the planning and zoning board and agreed to concessions regarding his zoning change and SUP applications, including a more restrictive zoning level and methods to address traffic and noise concerns, but the city council rejected his applications. *Id.* at 41–42. The *Wayne* court cited *Mayhew* in highlighting how Wayne had modified his initial re-zoning application and made concessions during negotiations with the board. *Id.* at 42.

Here, flooding damage and various code issues resulted in condemnation of the property after Hurricane Ike. Ben-Amram worked with City inspectors over a period of almost two years, spending between $200,000 to $300,000, in an attempt to resolve the code issues and obtain a certificate of occupancy. Beginning in January 2010, the City required the Property Owners to submit an engineer's letter certifying the property's safety. After the City informed the Property Owners in May 2010 about the loss of their "grandfathered" non-conforming status on the property, they submitted a SUP application. They were informed of and were encouraged to, but did not, attend the meetings where the Landmark and Planning Commissions considered their application. Ben-Amram attended and spoke at the February 2011 City Council meeting. Ben-Amram acknowledged that he had not completed the repairs as to several apartments and he needed to do "some more work." The City field supervisor assigned to the property confirmed that, to date, it was not code-compliant and the City had not received the engineer's letter. One of the Landmark and Planning commissioners suggested City Council deny the SUP as "an opportunity to say go forward and meet all these [building] codes and come back with a different application." This commissioner also noted that Ben-Amram could choose to "come back with another application that is less dense."[6]

Multiple councilmembers expressed particular reservations with granting the SUP.[7] Councilmember Gonzales cited public safety and the property not meeting code requirements. Councilmember Colbert also cited public safety, the code violations, and the lack of the engineer's letter. Councilmember Greenberg

---

[6] Several of Ben-Amram's neighbors also spoke, consistently requesting denial of the application. The record reflects that several of these neighbors had been in contact with City officials to complain about the property during the renovations.

[7] Aside from asking questions about an electrical panel, Councilmember Legg expressed no particular reservations and indicated being "very open to multi-family dwelling." Councilmember Puccetti also expressed no particular reservations.

11

indicated there were "too many things wrong" for him to support the SUP, including infrastructure and engineering concerns. Beeton noted the "significant attention from code enforcement," and lack of code compliance and the engineer's letter. Beeton also mentioned possible removal of four apartments to increase green space and alleviate parking problems. Mayor Jaworski appeared to be concerned with the property's "state" and "condition," acknowledging that "money can make any property nicer," but indicated that nothing prevented Ben-Amram from submitting another application with "even a slight tweak."[8] Jaworski also suggested that Ben-Amram speak to another apartment owner operating a multi-family complex in a single-family area to "find out what his business plan was." Councilmembers Gonzales and Greenberg both discussed reconsideration of the SUP application when all or substantially all of the repairs were completed. Councilmember Greenberg especially noted that this was "the first time" City Council was considering the application. City Council denied the SUP.[9]

At the hearing, it became clear that Ben-Amram was unwilling to consider any alternative plan involving removal of any units because it would not be "realistic" and he would "go bankrupt." But he further expressed his willingness "to keep working with the [C]ity and . . . to finish the buildings up to the code." Ben-Amram acknowledged that City Council told him "that [he] can bring it up to

_____

[8] Viewing the summary judgment record in the light favoring the nonmovants, *see Miranda*, 133 S.W.3d at 228, one possible "tweak" in a subsequent application could involve reducing the density of the property.

[9] Viewed in the light most favorable to the Property Owners, *see Miranda*, 133 S.W.3d at 228, although we agree that certain individual actions and statements by Jaworski and Beeton tend to reflect a preference for density reduction, for purposes of ripeness, we may not isolate individual councilmembers when determining the City's mind-set. *See City of El Paso v. Madero Dev.*, 803 S.W.2d 396, 401 (Tex. App.—El Paso 1991, writ denied), *cert. denied,* 502 U.S. 1073 (1992) (reversing trial court's judgment and dismissing based on lack of ripeness despite two city alderman stating "words to the effect that they wished to impede the development of the property by zoning the property" for more restrictive use (citing *Mayhew*)).

code and reapply." However, after the application was denied, Ben-Amram did not resubmit a SUP application that would have reflected completion of the repairs and/or an engineer's letter certifying the safety of the property. To the extent that City Council expressed any reservations as to parking, Ben-Amram also had indicated that he would make a "request for the parking variance" with the Zoning Board, but he did not.

Moreover, although the Property Owners insist the hearing was merely "scripted," we cannot agree that a fact issue exists on futility. There is evidence the City was open to reapplication for specific use of the property as multi-family dwellings, either: (1) with the same number of units, but after the property's repairs met all code requirements and/or the Property Owners produced an engineer's letter, or (2) with some reduction in density, namely, the four units in the newer building, ostensibly allowing for more parking or green space. According to the Property Owners, it is the second scenario that constitutes a taking.

This court faced a similar situation in *Riner v. City of Hunter's Creek*, 403 S.W.3d 919 (Tex. App.—Houston [14th Dist.] 2013, no pet.). There, the city's planning and zoning commission denied the Riners' application to replat their property to subdivide it into three lots. *Id.* at 921. Pursuant to the Riners' request, the commission certified 14 reasons for the denial of the replat. *Id.* Although the "gravamen" of the Riners' complaint was that the city misconstrued a lot-size ordinance when calculating the size of the proposed subdivided lots, they did not remedy the remaining bases for the commission's decision and then reapply, did not file an administrative appeal, and did not request any variances, so we concluded their requests for declaratory judgment were not ripe. *Id.* at 922–23, 924–26. We rejected their reliance on *Mayhew*, explaining that they "could have isolated the 'essential question' of lot size by remedying the remaining deficiencies

and reapplying to the commission, but they did not do so." *Id.* at 925.[10]

Here, the gravamen of the Property Owners' complaint was that the City denied their SUP application as a means of impermissibly requiring a reduction in density. However, even presuming that one basis for denial of the SUP permit was a preference for a reduced number of units, City Council expressly advanced distinct safety concerns related to the outstanding code violations on the property, as well as the still-outstanding engineer's letter. And although the Property Owners insist the parking requirement was "only a subterfuge to achieve a reduction in 'density,'" Ben-Amram testified that he never applied for a variance with the Zoning Board. The record therefore reflects that the Property Owners never isolated the essential question of density for the City's reconsideration. In other words, there was no reasonable "degree" of certainty that the City only would grant a SUP if the Property Owners agreed to remove four or more apartments. *See City of El Paso v. Madero Dev.*, 803 S.W.2d 396, 400–01 (Tex. App.—El Paso 1991, writ denied) ("After this degree is attained, the degree of taking can be arrived at.").

In these circumstances, we conclude that the Property Owners' regulatory takings claims with regard to the City's denial of the SUP application are not ripe. Therefore, the trial court erred in denying the City's plea to the jurisdiction with regard to, and we render judgment dismissing, the Property Owners' taking claims based on the denial of the SUP application. *See Chicory Court*, 271 S.W.3d at 422, 424; *Madero Dev.*, 803 S.W.2d at 400–01; *cf. Riner*, 403 S.W.3d at 925–26

---

[10] *Contra City of Harlingen v. Obra Homes, Inc.*, No. 13-02-268-CV, 2005 WL 74121, at *3 (Tex. App.—Corpus Christi Jan. 13, 2005, no pet.) (mem. op.) (claims ripe where planning and zoning commission informed landowner he was at "end of the line" as to other types of re-zoning applications and only could file application that would permit single-family homes on lot size landowner considered too large to be profitable, effectively issuing final denial of re-zoning application).

14

(trial court correctly concluded it lacked jurisdiction).

We sustain the City's issue.

## 2. Revocation of the property's non-conforming status as alleged taking

However, this does not end our inquiry. Within a supplemental brief,[11] the City contends that the Property Owners waived their right to raise any independent takings claim as to the May 2010 revocation of the property's grandfathered non-conforming status by filing the SUP application and failing to pursue an appeal with the Zoning Board of Adjustment in accordance with the zoning standards. To its supplemental brief, the City attached Ordinance Section 29-112 as the section governing appeals to the Zoning Board allegedly in effect at the time and the ordinance allegedly revising section 29-112. The Property Owners respond, taking issue with the City's attempt to supplement the record on appeal with city ordinances and arguing that it is the City which has waived this argument.

We first consider whether the Property Owners set forth a takings claim based on the City's revocation decision, apart from a takings claim based on the City's decision to deny the SUP.[12] When we review a trial court's decision on a plea to the jurisdiction, we liberally construe the pleadings in the nonmovant's favor and look to the pleader's intent. *Miranda*, 133 S.W.3d at 226; *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). After reviewing the Property Owners' original petition in this favorable light,[13] we conclude that they

---

[11] The City's plea to the jurisdiction below did not address the City's revocation decision. Nor did the City's initial appellate brief. The panel directed questions specific to the revocation decision to counsel during oral argument.

[12] We can discern, and the City points to, no reason aside from "waiver" why the Property Owners would not be able to allege takings theories based on two regulatory actions by the City.

[13] We further note that the City's plea did not challenge the Property Owners' pleadings, nor did the City file special exceptions.

15

sufficiently alleged a regulatory taking with regard to the City's earlier decision to revoke the property's grandfathered non-conforming status pursuant to section 29-111(a)(4). In particular, under their "cause of action–inverse condemnation and regulatory taking" section, the Property Owners specifically allege and take issue with the City's intentional actions in ostensibly or purportedly invoking its zoning regulations, specifically, "the six[-]month vacancy," to require a SUP.

Moreover, although the City couches its argument in terms of waiver, in this review of the trial court's ruling on the City's plea, we construe the City's argument in a jurisdictional light. That is, because the Property Owners did not request reconsideration or a variance from the Zoning Board as to the property's revoked non-conforming status, such claim is not ripe. We do not agree with the Property Owners that the City can waive ripeness as a component of subject-matter jurisdiction because a defect in subject-matter jurisdiction can be raised at any time. *See Mayhew*, 964 S.W.2d at 928; *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993); *Madero Dev.*, 803 S.W.2d at 400.

The record reflects the City informed the Property Owners in May 2010 that due to the over-six-months lack of occupancy of the property, it had lost its non-conforming status as multiple-family dwellings under section 29-111(a)(4) of the zoning standards. The City did not inform the Property Owners regarding any potential for appeal of this revocation, and instead indicated that a SUP application must be reviewed by the Landmark and Planning Commissions and approved by City Council prior to reoccupancy. Ben-Amram testified that the City did not inform him of any right to appeal.

16

Although there have been instances where appellate courts have taken judicial notice of municipal ordinances,[14] the City did not request that this court take judicial notice of the ordinance under Texas Rule of Evidence 204, the trial court did not take judicial notice of or indicate familiarity with the contents of section 29-112, only one of the City's submissions was certified, and the Property Owners here object to supplementation of the record. Further, even if we were to take judicial notice of the contents of section 29-112, i.e., that the Property Owners had the ability to appeal to the Zoning Board within a reasonable time, the City did not elicit testimony from Ben-Amram or anyone else such as from the Zoning Board that the Property Owners did not in fact do so.[15] The evidence in the record as to ripeness is focused on Ben-Amram's lack of SUP reapplication or application for a parking variance with regard to the City's denial of the SUP, not any alleged failure to obtain a final decision as to the City's removal of the property's grandfathered non-conforming status.

We conclude the City has not met its burden to establish that its revocation decision was not final and authoritative. *See Miranda*, 133 S.W.3d at 228; *Mayhew*, 964 S.W.2d at 929. Therefore, the trial court did not commit any error by denying the City's plea with regard to an alleged taking based on the City's revocation of the property's non-conforming status.

We overrule such issue as presented in the City's supplemental brief.

---

[14] *E.g., City Of Houston v. O'Fiel*, No. 01-08-00242-CV, 2009 WL 214350, at *1 n.1 (Tex. App.—Houston [1st Dist.] Jan. 29, 2009, pet. denied) (mem. op.); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.); *Leonard v. Burge*, 74 S.W.3d 135, 137 (Tex. App.—Beaumont 2002, pet. denied).

[15] Testimony from Ben-Amram that he was not told of any right to appeal is not the same as evidence that he did not do so.

17

# III. CONCLUSION

In light of the foregoing, we affirm in part the trial court's denial of the City's plea to the jurisdiction with regard to the Property Owners' takings claims based on the City's revocation of the property's grandfathered non-conforming status, and reverse in part the trial court's denial of the City's plea and render judgment dismissing the Property Owners' takings claims with regard to the City's denial of the SUP application.

/s/    Marc W. Brown
Justice

Panel consists of Justices McCally, Brown, and Wise.

18

NO. 12 CV0907

Joe Murphy, et al §
§
VS. §
§
City of Galveston §
§

12 - CV - 0907
DCORDENY
Order Denying
811872

2014 FEB 28 PM 3: 43

IN THE DISTRICT COURT

OF GALVESTON, TEXAS

10TH JUDICIAL DISTRICT

## ORDER

ON THIS DAY, the following was ORDERED by the Court:

The Motion to Dismiss for Lack of Subject Matter Jurisdiction of Defendant City of Galveston is Denied.

SIGNED: FEB 28 , 2013. 2014.

JUDGE KERRY L. NEVES
10TH DISTRICT COURT